DECISION
Insurance Company of North America ("INA") filed this declaratory-judgment action in September 1992 seeking a declaration of the rights, responsibilities, and obligations of INA, its insured Kayser-Roth Corporation ("Kayser-Roth"), and some thirty other of Kayser-Roth's insurance carriers. Precipitating this action was an environmental-liability claim asserted against Kayser-Roth by the United States Environmental Protection Agency ("EPA") under the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-75 ("CERCLA"). Kayser-Roth looked to its carriers for coverage of groundwater cleanup costs the EPA ordered it to pay. The incident causing the environmental damage was a 1969 spill of tricholorethylene ("TCE") at the now-defunct Stamina Mills, Inc. ("Stamina Mills") textile mill in North Smithfield, Rhode Island. The carriers and Kayser-Roth disputed which of some ninety insurance policies, including comprehensive general liability, environmental liability, umbrella, and excess coverage policies written over a period of some sixteen years, were applicable and whether any of those provided coverage.
Kayser-Roth and the defendant carriers counterclaimed and cross-claimed for declaratory judgment. The carriers asserted defenses against each other and against Kayser-Roth. Kayser-Roth brought bad-faith and breach of contract claims and made its own requests for declaratory relief. Presiding Justice Rodgers assigned the case to this Justice for case management and trial. The parties litigated for several years. One by one, Kayser-Roth settled with all of its insurance carriers except First State Insurance Company ("First State"). The settlements with the other carriers included confidentiality agreements as to the terms and the amounts of settlement. While many of the carriers may have estimated the individual settlement amounts, as well as the total paid to Kayser-Roth, the actual amount of the settlements is known only by Kayser-Roth and the Court. Noteworthy, however, is that the settlements were all-encompassing resolutions of the various carriers' disputes with Kayser-Roth. In other words, the settlements were general and disposed of claims in addition to those for liability coverage and costs of defense under any specific insurance policy. The carriers' settlements included, among other things, resolutions of the claims for bad faith, attorney's fees, and punitive damages. Some included releases from unrelated insurance contracts. The last of the settlements were not finalized until the very first days of trial.
 I The Pretrial Proceedings A. First State's Motion to Amend its Cross-claim Against Kayser-Roth to Add a Jury Demand
Although most of the carriers, including First State, waived their right to a jury trial, five of the smaller carriers, some of whom had claims against Kayser-Roth, claimed a jury trial in accordance with G. L. 1956 § 9-30-9. And at least one or two of those smaller carriers claimed a jury trial against other carriers they believed were responsible to provide coverage. During the course of extended Rule 16[1] pretrial proceedings, the Court attempted to identify the factual findings that would be common to all policies because great care had to be taken in deciding what matters could be severed and what matters could be consolidated. As part of this effort, the Court directed all counsel to identify the specific factual questions that needed to be resolved prior to the Court's making its declarations pursuant to G. L. 1956 § 9-30-1. To the extent that there were common factual questions, if not common legal issues, among the carriers waiving a jury trial and those which did not, the Court hoped that it could submit those narrow questions to a jury — absent, of course, any objections from the carriers who had not sought jury disposition and against whom no jury demand had been made. The parties' submissions concerning what facts could be resolved by a fact finder underscored the difficulties with attempting to try this case to a jury as well as of trying these claims in a consolidated fashion. While some of the submissions identified factual questions needing resolution, most offered conclusions that were not appropriate for consideration by a jury under G. L. 1956 § 9-30-9. Moreover, since the language of the various policies frequently conflicted (even among different policies issued by the same carrier), tremendous potential existed (1) for confusion and prejudice if the common factual questions were not kept very narrow and specific, and (2) for error if a jury were permitted to intrude upon the Court's function in construing and applying policy language. Adding to the difficulties were the parties' disputes over the facts relevant to the choice-of-law issues. Fortunately, as some carriers settled and others rethought their jury request, the jury-demand problem began to shrink. But it had not been resolved just yet.
In November 1995, First State moved to file an answer to INA's amended complaint and to amend its cross-claim against Kayser-Roth by adding a demand for a jury trial on all issues. Although G. L. 1956 § 9-30-9 provides that issues of fact in declaratory-judgment actions are to be tried and determined as in other civil actions and that the right of trial by jury shall not be abridged, Rule 57 provides that the right to trial by jury in declaratory-judgment actions shall be in accordance with the rules of civil procedure and that the right may be demanded under the circumstances and in the manner provided for by Rules 38 and 39. Rule 38 (a) requires that the party demanding a jury trial serve a written demand with the other parties not later than ten days after the service of the last pleading directed to such issue. And Rule 38 (c) provides that failure of a party to serve and file a demand as required constitutes a waiver by that party of their right to a jury trial. Because First State failed to serve and demand a jury trial as required, it waived its right to a jury trial.
When First State filed its motion, the targeted trial date had already been delayed and trial was scheduled for February 5, 1996. Given the multitude of legal and factual issues raised by First State and the other carriers in their quest to deny coverage, counsel and the Court were planning for a trial of several months. Counsel had undoubtedly invested significant time in trial preparation. This Court had not made its final determination concerning what issues might be severed and what issues might be consolidated. Dispositive motions were pending or in the works. Most of the witnesses were expected to testify by deposition and counsel were well into the development of their trial strategy. Thousands of pages of trial exhibits were in the process of being marked. All five of the First State policies were still at issue. And yet it remained unclear what precise factual questions First State wished to put before the jury. From First State's submissions, it appeared that First State expected that the jury would construe some portions of the policy language or would make mixed conclusions of law and fact in addition to making detailed factual findings. In the context of this case, a request for a jury trial made just several months before trial was not timely made in any event. This Court denied First State's motion to amend its answer.
There are two points concerning First State's motion to amend which deserve more discussion, for the consideration of which the Court will presuppose that there were jury triable factual disputes. First, the general rule is that if a timely and proper demand for a jury is made by one party, then all of the parties to the action who are interested in the issues for which jury trial has been demanded may rely on that demand and need not make an additional demand of their own. Wright and Miller, 9 Federal Practice and Procedure § 2318, at 137 (1995). As the Court has indicated, many of the issues here were so particular to each carrier that First State had insufficient interest to warrant its reliance on the other carriers' jury demand. Moreover, First State obviously did not rely on those other carriers' demands inasmuch as it moved to amend its answer to add a jury-trial demand. This brings the Court to the second point. The Court disagrees with the underlying assumption of First State's motion: that by the simple expedient of amending its answer it could remedy its procedural failing and add a jury demand. It is true that when an amendment to a pleading creates new jury issues, a party making a timely demand for a jury trial on those issues is entitled to such a jury trial. Duffy v. Mollo, 121 R.I. 480,400 A.2d 263 (1979). However, if an amended pleading does not raise a new issue then a jury trial right waived by a failure to make a demand in connection with the original pleading is not revived. Wright and Miller, 9 Federal Practice and Procedure § 2320, at 154 (1995). Thus, the motion before the Court was not governed by Rule 15's "freely given" standard, but by Rule 39 (b)'s discretionary standard. In that regard, our state Supreme Court held in Duffy that it would be an abuse of discretion to order an otherwise waived jury trial in the absence of a showing of anything akin to excusable neglect. Duffy, 121 R.I. at 490, 400 A.2d at 268. Mitigating against the Court's exercising its discretion to order a jury trial was both that First State failed to show excusable neglect and the inherent complexities of this case. Thus First State's motion to amend to add a jury demand was denied and the case was tried before the Court.
 B. The Preclusion Order
Other pretrial proceedings worthy of note include a preclusion order that entered just days before the trial began. The Court granted that order, given in a bench ruling on February 28, 1996, in response to Kayser-Roth's motions to compel First State to more responsively answer interrogatories[2] and, later, for discovery sanctions. The history of the preclusion order is as follows. Throughout the extensive pretrial proceedings (including the many pretrial conferences), First State asserted a number of defenses to coverage and limitations on liability arising out of non-First State insurance policies that purportedly afforded coverage for the 1969 TCE spill. First State contended, inter alia, that there were numerous policies of insurance issued by other carriers to which First State's policies were excess; that First State's policies and the policies to which they were excess contained various conditions, exclusions, definitions, and other terms the application of which would limit or defeat coverage; that First State was entitled to setoff any amounts that Kayser-Roth was entitled to under the other carriers' insurance policies; that Kayser-Roth's liability to the EPA for cleanup costs should be allocated among the policies affording coverage for that damage; and that First State was only liable to pay its pro rata share of the amounts covered by it and the other carriers' insurance policies. While taking issue with First State's contentions concerning the question of burden of proof, Kayser-Roth pressed its discovery requests. Those requests included the following interrogatories:
 5. State whether you contend that insurance coverage exists, under any insurance policy or policies issued by or on behalf of any insurance carrier other than yourself, with respect to all or any part of the claimed amounts.
 6. If your answer to Interrogatory No. 5 is affirmative, identify each insurance policy or policies providing such coverage.
First State objected generally to responding to Kayser-Roth's interrogatories because they were overbroad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. And First State specifically refused to respond to interrogatories five and six because they were premature and sought information regarding non-First State policies.
Nonetheless, yet without waiving its general or specific objections, First State thereafter supplemented its response to interrogatories five and six by stating that it was "presently unable to advise Kayser-Roth whether any of the policies issued by other carriers named in this litigation would respond to the. . . claim since First State has not yet reviewed the terms and conditions of those policies and discovery is still in a preliminary stage. Nevertheless, First State further responds that some or all of the other carriers may be able to rely on all [sic] some or all of the defenses to coverage set forth in First State's Supplemental Response No. `1.'" Response number one set forth at least seventeen defenses to coverage.
First State supplemented its response to interrogatories five and six a second time by adding that it was "unable to advise Kayser-Roth whether any of the policies issued by other carriers. . . would respond to the. . . claim since the court has not yet determined the choice of law issue with respect to the various policies, First State has not yet reviewed all the terms and conditions of those other carriers' policies, nor is First State aware of the facts surrounding certain of the other carriers' coverage defenses." In addition to the previously detailed seventeen defenses, First State also asserted that some or all of the other carriers might be able to rely on some or all of five additional defenses set forth in its second supplemental response to interrogatory number one.
By its third supplemental response, First State asserted that "all of Kayser-Roth's comprehensive general liability ("CGL") coverage in effect from January 1, 1969 to December 31, 1984 is applicable to the. . . claim. Further, all of Kayser-Roth's primary and first level CGL coverage is valid and collectible since there have been no allegations that the policies were procured through fraud and none of the carriers are insolvent." First State then set forth seventeen policies it contended "applied" to the claim prior to First State's umbrella policies. First State also set forth fifteen policies that it contended would share the remainder of the claim on a pro rata basis. Finally, First State asserted that "to the extent any of the above-referenced first level excess/umbrella policies do not contain a competing other insurance condition, then such policy(ies) apply completely prior to the First State Umbrella Policies, and, thus, may thereby serve to negate any coverage obligation under the First State Umbrella Policies." First State alleged that two policies "may not contain" such a competing other insurance condition.
As a result of First State's responses, Kayser-Roth made a motion to compel more responsive answers to interrogatories five and six. Kayser-Roth argued that First State had equivocated in its answers because while First State had been asked whether insurance coverage "exists" under any non-First State insurance policies, First State replied that all of Kayser-Roth's comprehensive general liability coverage in effect from January 1, 1969 to December 31, 1984 were "applicable" to the claim. Kayser-Roth argued that "[t]o say that policies are `applicable' should be the same as saying that coverage `exists' under the policies (which, in fact, was the question). Is First State now saying that none of the other carriers have any of the defenses to coverage that First State referred to in its earlier answers?" Kayser-Roth sought to have First State ordered to "state unequivocally whether it is now taking the position that there are no defenses to coverage under the other policies listed in its Third Supplemental Responses and whether it takes the position and intends to prove that coverage in fact exists under the terms of those policies."
At the hearing on Kayser-Roth's motion to compel, First State argued that it had satisfactorily answered interrogatories five and six. The Court, however, found that First State equivocated when it used the word "applicable" and ordered First State to identify the specific policies that it asserted were not only applicable to the loss, but which were not subject to any defenses to coverage, that is, that afforded coverage. Counsel for First State indicated that he understood the Court's order. And the Court made it clear that it would consider sanctions in the form of an order precluding First State from introducing evidence on the issue of other insurance if First State failed to comply with its order.
In response to the Court's order, First State amended its third supplemental response by stating that "[w]hether or not [the previously-identified policies] are without defenses to coverage is a legal determination for this Court to make. To the extent this Court decides there are no defenses to coverage under the CGL policies, then First State submits that the other insurance clause applies." Kayser-Roth then moved for a preclusion order.
At the hearing on Kayser-Roth's motion to preclude, the Court asked First State whether it contended that there were no viable defenses to or limitations on the coverage provided by the other insurance. Initially, First State responded by saying that its burden of proof did not require it to show the absence of any defense under those policies. However, regardless of which of the parties carried the burden of proof on any point of liability or damages, it was important to identify which policies of insurance First State maintained would affect its obligation to provide coverage and the amounts of that coverage. Upon second inquiry, First State's counsel responded by stating that "[o]ur client does not authorize us to make that contention." The Court then inquired whether First State contended that there were viable defenses to or limitations on the coverage provided by other insurance. First State answered that it did not make that contention either. Apparently, First State contended that the other policies were triggered, but had no contentions regarding viable defenses to or limitations on the other insurance. First State felt that merely by showing that the other policies were triggered, it had satisfied its burden of proof that there was other insurance available for the claim.
It was clear to the Court, however, that First State really had a threefold objective. First, to reserve and preserve its position that other coverage existed which should be considered to be available for purposes of setoff or allocation and/or to which First State should be declared to be excess only. Second, to reserve and preserve its position that there were defenses to certain of the other insurance policies upon which First State could rely to avoid its own liability. And, third, to reserve and preserve its position that other insurance applied to the Stamina Mills claim which, in turn, precluded coverage under those other policies the exhaustion of which would trigger First State's excess coverage. The Court found that First State's failure to disclose its contentions, to authorize its counsel to have contentions, and its lack of contentions based upon its beliefs regarding the burden of proof significantly affected Kayser-Roth's ability to prepare for trial. Nonetheless, before deciding Kayser-Roth's motion, and at First State's counsel's request, the Court allowed First State's counsel to confer with his client to consider the risk that it faced as a result of its position. The Court then gave First State the opportunity of further responding in one of two forms prior to its deciding Kayser-Roth's motion: First State could supplement its pretrial memorandum (where one would expect to find such legal contentions) or could further respond to interrogatories five and six. If First State stood by its position, the Court would rule.
The time for First State to rectify its answer came and went and thus the Court ruled on Kayser-Roth's motion. The Court found that First State had failed to respond as ordered and that it was not excused by its analysis of the burden of proof or by its determination not to give its counsel the authority to form a contention. The Court also rejected First State's argument that neither it nor its counsel took any position or made any contention with regard to defenses to or limitations on the other insurance because First State's discovery responses and pretrial memorandum clearly demonstrated otherwise. First State's responses and conduct indicated that it was avoiding providing the requested information and that it was doing so deliberately. What may have been its true reasons for not responding adequately to the discovery requests or to the Court's direction that First State could include the information in the pretrial memorandum came to light during the course of one of the hearings. During that hearing, counsel for First State conceded that if First State were to supply the requested information then First State would jeopardize its own legal position in some other lawsuit, unrelated to this litigation and these policies, but which apparently concerned some of the same language appearing in the policies at issue in this case. The Court found that Kayser-Roth would be materially prejudiced in its trial preparation because it would have to litigate and offer proof on every aspect of the policies First State had pointed to in its interrogatory answers and pretrial memorandum as opposed to just those which could genuinely be expected to affect First State's coverage or liability. Having to do so would have diffused Kayser-Roth's efforts to mount an effective approach to the trial proof and would have diluted its efforts with respect to the policies which were truly at issue. Furthermore, First State's refusal to provide the information sought interfered with the Court's ability to simplify the issues for trial and avoid unnecessary proof at trial. First State had already come close to creating a Gordian knot with its efforts to cling to all of its conflicting theories and alternative arguments concerning which of the other carriers' policies afforded coverage for the spill. Depending upon the moment and its immediate purpose, First State was just as likely to argue that any given policy of insurance would or would not afford coverage.
The Court thus precluded First State from presenting or producing evidence at trial in any form relating to the existence of coverage for the EPA claim at issue under any other policy or contract of insurance or indemnification. First State was also precluded from advancing any contention or making any argument in any form relating to the existence of coverage for the EPA claim under any other policy or contract of insurance or indemnification in which argument or contention derived in any manner from the trial evidence. Finally, First State was precluded from presenting or producing evidence and from advancing or making any contention or argument in any other proceeding whether before this Court or in some other forum from which it would derive any benefit from setoff, pro rata allocation, or reduction in judgment amount with respect to the EPA claim at issue. First State was not, however, precluded from making a purely legal argument, in the context of this litigation, that it should be entitled to setoff, allocation, or reduction in judgment amount because of other carrier's liability to pay a particular amount of damages. The Court found this preclusion order to be the least harsh it could craft considering the consequences to Kayser-Roth of First State's failings. Seegenerally Mumford v. Lewiss, 681 A.2d 914, 916 (R.I. 1996) (affirming dismissal of action by plaintiffs who chose to be noncompliant and dilatory" rather than "`take advantage of the offered opportunities to answer without penalt[y]'");International Depository, Inc. v. State of Rhode Island,603 A.2d 1119, 1124 (R.I. 1992) ("[t]he trial justice selects the sanction he or she believes is `most appropriate for the situation in question'"); Trend Precious Metals Co. v. Sammartino, Inc.,577 A.2d 986, 989 (R.I. 1990) (even where dismissal is available as a sanction, "the facts. . . do not justify the imposition of such a severe sanction when an alternative, less drastic method is readily available").
First State requested that the Court reconsider its preclusion order. But at the hearing thereon, it indicated that it still did not plan to provide the information requested. The Court denied First State's motion to reconsider.
 II The Trial
After last minute delays, trial began and the case was tried to the Court commencing March 5, 1996. Originally, the parties and the Court agreed that the case would be tried in two phases. Phase I, the liability phase, would determine which policies were triggered and provided coverage for this loss. Both the parties and the Court anticipated that the Court would make some initial declarations at the end of Phase I. The parties remaining as litigants in the case would then proceed to Phase II, the damages phase, which would determine the various carriers' shares of the loss and their responsibility to pay for the cost of cleanup. During Phase II the Court was also going to make its final declarations as well as some declarations concerning the higher-tier excess carriers. Whether those policies were implicated depended upon the size of the insurance fund generated by the underlying coverage. It made no sense to require that the carriers whose policies were not triggered participate in extensive damages hearings. Although the terms "liability" and "damages" are not the best characterizations of the two phases, with the number of parties and insurance policies involved, as well as the number and complexity of the issues, bifurcation appeared to be the best option.
Ultimately, however, with only two parties left in the case, Phase I rolled immediately into Phase II. And then, on the eve of trial, Kayser-Roth dropped its claims over three First State policies, leaving only its claims for coverage under policies 950506, with a policy period of January 1, 1982 to January 1, 1983 (the '82 policy), and 951721, with a policy period of January 1, 1983 to January 1, 1986 (the '83/'85 policy). Although copies of the declarations pages contained in the record are difficult to read, it appears from the upper left-hand corner of the "Declarations" page of the '83/'85 policy that it was a renewal of the '82 policy.
At the Court's direction, the parties pre-marked hundreds of exhibits and thousands of pages of documents. Ultimately, however, only a small portion of these were offered at trial and even fewer admitted into evidence.
At trial, counsel for Kayser-Roth made an opening statement which provided the Court with an appropriate overview of both the trial evidence and Kayser-Roth's legal claims. First State waived its opening statement. At that moment, this seemed innocuous. However, it caused confusion during the trial. Without an opening statement, the Court remained unenlightened as to which of the many defenses, theories, and claims raised by First State during the pretrial proceedings were actually at issue with respect to these two policies. See generally Avarista v. Aloisio,672 A.2d 887, 892 (R.I. 1996) ("`[t]he proper function of an opening statement is to apprise the. . . [fact finder] with reasonable succinctness what the issues are in the case. . . and what evidence the prosecution and the defense expect to produce at trial in support of their respective positions'"). Without that context, it became difficult to understand the purpose for which certain evidence was offered and to make rulings on the admissibility of evidence.
Although First State, like the other litigants, submitted both a pretrial memorandum and a revised pretrial memorandum, neither sufficiently narrowed the trial issues for the Court. For example, First State, by its revised pretrial memorandum, identified six provisions in the '82 policy that it asked the Court to apply and identified eight other policy provisions pursuant to which First State asserted coverage should be denied entirely. Similarly, for the '83/'85 policy, First State identified seven policy provisions that it asked the Court to apply and identified seven other policy provisions pursuant to which First State asserted coverage should be denied entirely. Moreover, the revised pretrial memorandum identified a dozen legal issues, some of which were unrelated to specific policy defenses, and raised nearly twenty affirmative defenses with a "reservation" of the right to assert other unidentified or equitable defenses during the course of trial. Some of the affirmative defenses were substantially the same as the other identified issues, some were not. The revised pretrial memorandum did not correlate the enumerated legal issues and defenses to a specific policy. And then, on the second day of trial, First State dropped its notice, misrepresentation, concealment, and fraud-based defenses. Later it identified known-loss as its only affirmative defense. During the course of the trial, First State raised only one previously unidentified defense or issue.
During the course of the trial and at the close of Kayser-Roth's presentation of its case, First State moved pursuant to Rule 52 for judgment on partial findings. The Court declined to render any judgment until the close of all of the evidence. At the end of the trial, only one issue remained open. That was the admissibility of the confidential settlement agreements entered into by Kayser-Roth and its other carriers. During the damages phase of the trial, First State subpoenaed the settlement agreements in an effort to move them into evidence as part of its so-called "setoff" defense to damages. Kayser-Roth moved to quash the subpoena and objected to the use of the agreements at trial. The Court reserved decision.
The Court initially anticipated that it would rule first on the question of the settlement agreements which were submitted to the Court for an in camera review. Next, it would either admit the agreements and take further evidence concerning them before concluding the trial or the Court would sustain the objection, quash the subpoena, and close the proceedings. But nothing has been simple in this case. The Court found it necessary to resolve at least some of the legal and factual questions concerning coverage before it could determine the relevancy of this proffered evidence to damages. Accordingly, the Court directed the parties to submit their post-trial memoranda on all issues as well as their proposed findings of fact. At the same time, the Court continued to leave open the question of whether the settlement documents or related evidence would be ultimately admitted and for what purpose.
The parties have filed their post-trial memoranda and their proposed findings of fact. The proposed findings of fact remain no less conclusory than the parties' pretrial submissions. For the most part, the proposals mix the facts with the law and ultimately go to the construction of the policies.
The first order of business before the Court, then, is to rule on Kayser-Roth's motion to quash First State's subpoena and on its objection to the introduction of the settlement documents into evidence. The motion to quash is granted and the objection is sustained. The Court will address this matter in more detail at the conclusion of its findings of fact and conclusions of law.
Now, in accordance with Rule 52 (a), the Court makes the following factual findings and conclusions of law arising out of Kayser-Roth's trial of its cross-claim against First State. The Court will begin with a review of the trial evidence and will articulate some of the factual findings essential to the case. When the Court turns to the individual policies, it will make additional findings and articulate additional conclusions as necessary.
Most of the evidence in this case stands credible and consistent. Indeed, many of the facts are undisputed. Stamina Mills was a textile manufacturing operation in North Smithfield, Rhode Island from approximately 1952 until 1975. In 1966, Kayser-Roth Corporation acquired the operation and operated it through its Crown Textile division ("Crown Textile"). That division was named for Crown Textile Manufacturing Company. Crown Textile Manufacturing Company had at one time owned stock in the mill operation. In 1975, Kayser-Roth was acquired by Gulf + Western Industries, Inc. ("Gulf + Western"). Gulf + Western has since changed its name to Paramount Communications and is now owned by Viacom. In 1976, Kayser-Roth closed the mill operation and sold the site to an unrelated third party. Gulf + Western continuously owned Kayser-Roth until 1985 when Kayser-Roth was sold to Wickes Companies, Inc. Wickes Companies, Inc. is the operating subsidiary of Collins Aikman Products Company ("Collins 
Aikman"). Kayser-Roth was continuously owned by Collins Aikman throughout this litigation.
In 1969, Stamina Mills used TCE as part of its textile scouring process. During the latter half of 1969 an accidental spill took place when the hose of a tanker truck uncoupled during delivery of TCE to the plant. An unknown quantity of TCE spilled onto the ground and partially into the Branch River. Manual Freitas, the Stamina Mills plant manager, either witnessed the spill or became immediately aware of it. The TCE from the spill quickly soaked into the soil and sank until it infiltrated the groundwater-saturated underlying soils and thus polluted the environment. The TCE spilled near an artesian well used by the plant for its drinking water. Three or four months after the spill, Stamina Mills employees noticed a sweet taste to the well water. The state health department became involved and conducted an investigation. Stamina Mills began to supply bottled water for its employees. The first purchases of bottled water were in 1969. From the time shortly after the spill and during the ensuing years the TCE contamination, by a continuous process, spread through the groundwater, harming more and more of the local water supply as it went. By 1979, the contamination had spread to neighboring properties and had become public knowledge. Area residents asserted claims against Crown Textile and Kayser-Roth. In February 1981, an area resident, Norman J. Langlier, filed suit against Kayser-Roth in Langlier v. Fagan, et al., C.A. No. PC81-749, seeking damages resulting from TCE contamination of his property. In September 1984, the EPA served Kayser-Roth with a demand letter identifying Kayser-Roth as a "Potentially Responsible Person" ("the PRP letter"). The PRP letter demanded that Kayser-Roth take certain steps to remediate the environmental impairment caused by the TCE spill or risk a lawsuit for recovery of the costs incurred by the EPA's remediating it. On the advice of a local attorney, Deming E. Sherman, a partner in the law firm of Edwards and Angell, Kayser-Roth spit into the prevailing wind and declined the chance to respond consistently with the demands of the EPA. Consequently, the EPA filed suit in 1988 and, after finding the evidence against Kayser-Roth overwhelming, the United States Federal District Court for the District of Rhode Island entered judgment against it for the costs of remediation. The case went to the United States First Circuit Court of Appeals and, eventually, the United States Supreme Court. The judgment against Kayser-Roth was upheld. Kayser-Roth was found to be liable to the EPA for $846,492.33 and was declared to be liable for response costs and future costs stemming from on-site cleanup (at Stamina Mills) and off-site cleanup (at the residential wells).
John Merrick's deposition testimony was admitted at trial. Merrick was the chief financial officer to Crown Textile. Merrick testified that he met and discussed the spill with Manual Freitas, who told Merrick that the well water was polluted and that Crown employees were forced to drink bottled water. Merrick testified that he could not pinpoint the time of his conversation with Freitas but it was certainly prior to the time Stamina Mills was sold by Kayser-Roth in 1976. Merrick testified that the spill and the "well problem" were considered minor matters, an inconvenience perhaps, but nothing more. It seemingly had little effect on anything except the Stamina Mills site itself. The Court accepted this testimony as true and gave it weight. It was, in general, supported by the testimony of Norman Beier and the balance of the trial evidence. By 1979, Merrick was aware of the TCE spill and that TCE contamination was alleged to have affected neighboring wells. He followed the media coverage of the problem. It was not his sense, however, that Kayser-Roth could be held legally responsible for the contamination of the area's water supply. Kayser-Roth's connection with the Stamina Mills site seemed remote to him, both legally and in time.
The testimony of Norman Beier was admitted at trial. During the 1970's Beier was general counsel to Kayser-Roth. During 1975 and 1976, Beier was involved in the sale of the Stamina Mills property. Although he was clearly not certain as to the all of the pertinent dates, Beier testified that at some point he met with John Merrick and discussed the spill. Beier also testified that he discussed the spill with Manual Freitas. Beier made an inquiry about the spill and its effects. Beier's testimony was sometimes internally inconsistent and, at times, he contradicted Merrick's testimony. Whether it was because of the passage of time or because of his disenchantment with Kayser-Roth's parent company, Gulf + Western, remains unknown. Nonetheless, the Court found his testimony to be credible overall and that his testimony was generally consistent with the balance of the trial evidence. Given the number of intervening years, the Court was not particularly troubled by the various witnesses' inability to recall certain details.
Beier testified that sometime during 1976 to 1981 he had several conversations with Merrick about the spill. He testified that he undertook a casual investigation of the spill in 1979 when he attempted to discover the identity of the truck driver who caused the spill. He testified that he did so in 1979 because of his concern for potential lawsuits against Kayser-Roth. He testified that prior to 1979, all that was known about the TCE contamination was the effect it was having at the Stamina Mills property. Beier did not believe, prior to 1979, that the spill might generate a lawsuit. He pointed out during his testimony that environmental issues were not a "big thing" in those years. He testified that he did not put the Kayser-Roth insurance carriers on notice of the TCE contamination. Until the Langelier
suit was filed, Beier did not perceive that anyone was making an actual claim for damages over such a thing. The Court accepted Beier's testimony as true and gave it weight.
It is undisputed that by 1979 the fact of the local area groundwater contamination had become public knowledge. The evidence is, and the Court finds, that it was no later then 1979 when Kayser-Roth knew about the off-site contamination and that it was concerned about the connection between that contamination and the 1969 spill. At least one local attorney had made a demand upon Crown Textile and Kayser-Roth by late 1979. According to a memorandum written on December 13, 1979 by Richard Sheer to Norman Hinerfeld, the Kayser-Roth legal department was handling that matter. The memorandum is contained in First State's trial exhibit L. By the time the Langelier lawsuit was filed in 1981, Kayser-Roth had already given some level of consideration to the risk that it might be legally liable to neighboring property owners for damage to their property. Both Merrick and Beier testified about their concerns over the question and the steps they took to investigate the matter. First State's trial exhibits J, K, L, and M support that testimony. The Court gave weight to the exhibits.
Norman Hinerfeld testified. He was the president of Kayser-Roth beginning in 1975. When Kayser-Roth was sold to Gulf + Western he became chairman of the executive committee for the company. In 1979 he learned of allegations that the Stamina Mills spill was the cause of local water contamination. Hinerfeld ordered an investigation and was informed there was a possible connection but there could be other reasons for the contamination. He testified that in 1979 he was concerned about the possibility of a claim. He did not articulate the precise nature of the claim he feared. At that time, CERCLA had not yet been enacted. From the testimony, the concept of a claim was related to an individual lawsuit for damage to private property interests. Negative publicity was a concern to Hinerfeld as it was to Beier and Merrick. Hinerfeld testified that the "whole thing was like a tempest in a teapot" but that he "was not very much concerned." The Court found Hinerfeld's testimony to be credible and consistent with that of the other witnesses. The Court gave it weight.
Pearce M. Kiazer testified. He is a former employee of the State of Rhode Island Department of Environmental Management. In 1979 he learned from the State of Rhode Island Department of Health that Manual Freitas had witnessed or was aware of the 1969 spill. He and another Department employee interviewed Freitas. Kiazer had certain theories about the existence of TCE contamination in the area and how it came about. From his testimony, he had an intuitive sense of what might have occurred but there was no scientific basis to it. The Court did not give much weight to his testimony in that regard. This evidence did, however, confirm that Freitas was well aware of the spill in 1969 and that by 1979 Kayser-Roth was aware of its potential significance, that is, that the harm caused by the spill may have extended beyond the Stamina Mills property and that local property owners might attempt to hold Kayser-Roth responsible for that harm. Klazer's testimony confirmed that Kayser-Roth was aware of a potential link between the spill and the contamination of the local wells.
Peter Shanahan testified. He is an expert in hydrogeology. He was presumably presented for the purpose of giving certain opinions but the Court was never quite able to determine the nature of the opinions or what facts and data he relied upon in rendering his opinions. Shanahan spent a considerable amount of time indicating what material he read for general background. For the most part he pointed to piles of documents without identifying any specific facts and data upon which he was premising some particular opinion. He prepared charts to show the extent of TCE in the groundwater. Again, he used the documents to which he had been referring but it was impossible to tell the specific source of his data or his methodology. The point of much of his testimony was unclear. It seemed to be offered to bolster the contents of or opinions contained within the documents to which he was referring. At one point he appeared to be about to offer an opinion concerning his analysis of the water flow in the area of the Stamina Mills site. He did testify that groundwater flows downhill — a basic tenet of hydrogeology. He also testified that there is an aquifer underlying the Stamina Mills/Forrestdale area and that water enters an aquifer through the process of "recharge." He described a process whereby water enters the land surface from the rainfall and snow melt, percolates through the soils, reaches the water table, and enters the aquifer. This, he testified, was an accepted principle of hydrogeology. To this extent, Shanahan's testimony made sense and the Court found it very credible. The Court sustained Kayser-Roth's objections to the witness' testimony that the contamination had reached the groundwater in 1969. The witness had been led to this conclusion without a sufficient articulation of the facts and data used to support it. In any event, this evidence would have been cumulative — there was no serious dispute that the TCE contamination had reached the well and polluted it by the end of 1969. The Court accepted the testimony of Mr. Shanahan as generally credible. The Court found it helpful in understanding the process of recharge and in understanding the direction in which groundwater and an aquifer will ordinarily flow. The testimony shed light on the continuous nature of the harm caused by the infiltration of TCE into the soil below the mill site. Shanahan's testimony was consistent with the balance of the trial evidence and what is known and agreed to in this case.
Geneviev Trudeau, of Smithfield, Rhode Island, testified that she smelled something ether-like in her new well in the late 1970s or so. She had her lawyer send letters to Crown Textile. She was credible. Her testimony was cumulative to the extent it showed that, by 1979, Kayser-Roth was aware the that there was TCE contamination of local wells and that local property owners were making claims against Crown Textile Company for damage to their property.
First State presented each of these witnesses. Their testimony was not substantially contradicted and was quite consistent with the known and accepted facts. The testimony of these witnesses and the related exhibits including the stipulated facts comprised the bulk of evidence relevant to any determination concerning the date of occurrence for the purpose of triggering coverage under these hybrid liability and excess policies. This evidence also has relevance to First State's "known loss" defense and other arguments.
The Court specifically finds, based upon these facts and this evidence, that by sometime in 1969 TCE spill had manifested itself within the confines of the Stamina Mills property as a damage-causing event responsible for contamination of the environment. The Stamina Mill property was damaged in that the artesian well located on the premises became polluted. Likewise, the environment was harmed in that the groundwater beneath the mill site had been contaminated. The Court finds that the damage to the groundwater was actually discovered and known to Crown Textile and its employees, including its plant manager. The circumstantial evidence is that Crown Textile and its employees attributed the water's sweet taste to the spill and that by sometime in 1969 the plant was purchasing bottled water for its employees. At that point, the Court finds, it would have taken little effort to confirm that it was indeed TCE which was present in and had contaminated the well. The evidence in the case, generally, is that water testing will disclose the presence of TCE. By sometime in 1969 when the plant began to purchase bottled water, the damage to the Stamina Mills property and the groundwater had manifested itself and was not only discoverable, it had been discovered.
The Court further finds that the off-site indicia of the damage-causing event, that is, the appearance of TCE in the neighboring wells, manifested itself no later then 1979. The appearance of TCE in the local water supply and the potential link between that and the 1969 spill had come to the attention of Kayser-Roth officials and was discoverable by them no later, the Court finds, then 1979. A person exercising reasonable diligence in 1979, the Court finds, could have determined the nature of the damage to the local wells and its probable source. Certainly, by early 1981, with the commencement of the Langelier suit, Kayser-Roth officials had sufficient information to cause a reasonable person to investigate and to discover that TCE from the mill site migrated through the groundwater and had caused contamination of the local water supply.
The Court finds that after the 1969 spill and when the TCE infiltrated the groundwater saturated soils below the mill site, the harm caused to the local water supply was spread by the continuous and natural processes of the environment, including the recharge of the aquifer. That the harm caused by the spill and the subsequent contamination of the groundwater saturated soils was continuous in nature does not seem to be disputed by the parties. The Court finds that the damage continued until at least the time when the remediation efforts first began.
First State presented several other witnesses whose testimony was relevant to First State's known-loss defense and what have come to be called its "Aetna defenses."
Peter Butler testified and was credible. He was an executive in charge of Gulf + Western's insurance program during the early 1980s. The Stamina Mills site had been sold prior to his being hired. In August of 1982, Butler signed a proposal form to obtain insurance coverage for environmental impairment. The proposal included a schedule of pending claims and cases. A good number of the cases were lawsuits brought by the EPA in the late 1970s and early 1980s against various of the Gulf + Western manufacturing or industrial operations. Some of the cases had to do with the discharge of pollutants into local creeks and ponds. One claim involved a Colorado-based Gulf + Western mining operation which allegedly caused damage to downstream water supplies. The proposal contained no mention of the Stamina Mills spill or the pending Langelier action. The proposal is First State's trial exhibit TT. Butler testified that he did not know who prepared the schedules which itemized the claims. He testified that he gave the proposal to Gulf + Western's general counsel to complete. Butler had no access to the legal department's files on claims for litigation.
Butler testified that he was aware that certain of Gulf + Western's reinsurers desired an environmental risk assessment. The assessment was commissioned by Butler in late October of 1981. The relevant trial exhibit is Kayser-Roth's exhibit 138. The written report on risk assessment is First State's trial exhibit SS. That risk assessment is dated September 8, 1982 and reports on a variety of spills and other causes of environmental pollution which were caused by Gulf + Western operations. Included in the report are details of two Gulf + Western sites at which chemical contamination spread through groundwater. The Stamina Mills site is not mentioned. Nor is the Langelier suit which had not yet been dismissed. Butler testified that he was unaware of what sources the independent risk assessment group used in identifying claims.
Some of Butler's testimony was presented by Kayser-Roth. Butler testified that he first heard of the Stamina Mills problem in 1984. He testified that he heard from Michael Helm that Kayser-Roth had been cited by the EPA. Butler testified that he was directed to notify Kayser-Roth's insurers. He also testified that any environmental claims were handled directly by the legal department. This Was all credible, consistent with the balance of the trial evidence, and unrefuted. The Court gave it weight.
Butler also testified about a retrospective agreement made between Gulf + Western and Aetna Casualty Insurance Company ("Aetna"). The January 9, 1995 agreement (First State trial exhibit YY) allowed Aetna to recoup any losses which it paid out on Gulf + Western's behalf under a 1984 gradual environmental impairment liability policy it issued to Gulf + Western — a policy for which Kayser-Roth is an insured and which is at issue in this case. Butler testified that he had probably entered into hundreds of these kinds of agreements in the course of managing the global corporate insurance program. The industry practice is to make retrospective agreements separate from the policy itself.
Though credible, some of Butler's testimony seems to be most relevant to First State's abandoned misrepresentation, fraud, and concealment defenses.
Trial exhibits SS and TT, identified by Butler, are also relevant to the known-loss and other defenses. Trial exhibit SS, the risk-assessment document report, demonstrates that in September 1982 Gulf + Western was informed by its commissioned risk-assessment group that a number of its operations were considered to be at high risk for environmental liability. Although Stamina Mills was no longer operating and the site had not been owned by Kayser-Roth for some time, the risk-assessment report remains significant in that it speaks in terms of environmental liability and the Superfund Interim Priority list. The Superfund was created as part of CERCLA. Furthermore, the report links contamination of local groundwater and neighboring domestic wells with environmental liability in its discussion of at least one site. Gulf + Western's Clarksville refinery is characterized as a significant potential risk factor for environmental liability on account of contamination of surface water, groundwater, and public waters. The report notes, as a matter of particular concern, the possibility that contaminants had been deposited in the ground sediments even in the areas where discharges no longer occurred. The report recommends installation of on-site groundwater monitoring wells designed and implemented by a professional hydrogeologist. It also notes that Gulf + Western conducted off-site testing of neighboring water supplies including domestic wells. The report states that the Clarksville refinery had two full-time environmental engineers on staff whose duties included monitoring, regulatory compliance, and assuring that the manufacturing processes at the refinery were not creating environmental liabilities. The report gave some of the history of Gulf + Western's previous activities in responding to potential and actual environmental problems. The report also chronicles a December 18, 1981 meeting between Peter Butler and Clayton Environmental Consultants ("Clayton"). Clayton was the survey consultant to the risk-assessment group which generated the written risk-assessment report found at trial exhibit SS. The purpose of the meeting was preliminary data acquisition.
First State's trial exhibit TT, the proposal for environmental liability insurance, likewise ties Butler and the Gulf + Western insurance program managers to the suggestion of risk of liability for environmental impairment as distinct from liability for damage to private property.
The testimony of John Merrick and Norman Beier also holds relevance to the question of when Kayser-Roth officials knew they were facing the risk of liability for the costs of remediating the spill. Judging by the examination into his background and qualifications, Beier is a competent professional who was, at the time, dedicated to protecting the interests of Kayser-Roth. Yet because of the context of the times, he, like Merrick and the others, did not recognize or appreciate Kayser-Roth's exposure to legal responsibility for environmental damage and the costs of remediation. They knew, to be sure, of the damage to their own property, and were concerned about damage to the neighboring properties, but they did not comprehend the greater implications. They did not appear to have perceived the spill to be something which had wrought large scale harm to the environment as a whole and they were not aware of any potential risk that the company would one day be held accountable for the costs of cleaning up the environment. The Court finds that by 1979 they knew or should have expected that Kayser-Roth or a related entity was at risk of being sued by neighboring property owners for the harm allegedly caused to those properties on account of the contamination of the local water supply. They did not recognize, however, the specific peril at issue in this case, that is, a judgment for the economic losses associated with the EPA-ordered environmental cleanup. CERCLA had not yet been enacted and it does not appear from the record in this case that the State of Rhode Island could have been expected to require remediation. The Court finds that in 1979 Kayser-Roth officials did not know of the risk of loss associated with CERCLA liability and they could not have known of the loss which would ultimately stem from that liability.
Furthermore, when considering the body of evidence and the inferences reasonably drawn therefrom, the Court is not persuaded that officials with Kayser-Roth or Gulf + Western knew of the potential peril facing the companies prior to 1984 when Kayser-Roth received the EPA's PRP letter. The evidence is that nobody at either Kayser-Roth or Gulf + Western appreciated the true significance of the spill or the events of 1979 through 1981. To be sure, they recognized and understood, the Court finds, that the spill was a noteworthy event, that it was a cause for concern, and that it could yield potential consequences, including the risk of liability to identifiable neighboring property owners. However, the Court is not persuaded that Kayser-Roth or Gulf + Western officials realized they risked liability or potential liability for remediation of the general environmental impairment related to this site prior to September 1984 when the letter identifying Kayser-Roth as a "Potentially Responsible Party" was served by the EPA. If Kayser-Roth or Gulf + Western officials had become aware of or even concerned about this potential liability, the evidence in this case does not so reveal. And the circumstantial evidence is not enough to persuade the Court that they had. Furthermore, the evidence is that after being served with the PRP letter, Kayser-Roth relied upon the advice of its local attorney, who advised it that there were viable defenses to the EPA claim.
Michael Helm testified. In 1979 he was a casualty-claims representative with Marsh and McLennan. That company was an insurance agency which acted as a liaison between insurance clients and insurance carriers. Starting in 1983 Helm worked for Gulf + Western in notifying carriers that excess insurance might be involved in a claim. He described the process by which the company would report claims to the appropriate insurance carriers. He testified that the Gulf + Western legal department would decide whether to put an insurance carrier on notice for a particular claim and for what policy year the claim would be made. Helm returned to Marsh and McLennan in 1985. Helm was credible and his testimony was consistent with the testimony of the other witnesses. Helm testified about his discussions with others about how the Stamina Mills EPA claim was most appropriately handled from an insurance-coverage perspective. When Aetna was given notice in 1984 of the EPA's PRP letter, there were differences of opinion over how it should be handled. Aetna focused on the September 25, 1984 PRP letter, identifying it as a "claim" and determining it should treat that claim as one covered under its claims-made gradual environmental impairment liability policy 01 AL 482897 SCA (Kayser-Roth trial exhibit 30), which provided excess coverage during 1984. Gulf + Western, on the other hand, focused on the specific event which precipitated the Langelier and EPA claims. It wanted to place the event, the "occurrence," within an Aetna occurrence-based comprehensive general liability policy which provided primary coverage during 1979. The difference in the two approaches is significant. The former is a "claims"-based approach that goes to trigger of coverage for a typical "claims-made" policy. The latter is an event-based approach that goes to trigger of coverage for the typical "occurrence"-based comprehensive general liability policy under which the damage-causing event will most often be required to take place within the policy period.
Helm was credible but his testimony was not particularly enlightening beyond what seems to be undisputed in this case, that is, how Aetna determined it would handle the claim. Kayser-Roth trial exhibit 363 sums it up. It was Helm's testimony that he disagreed with an analysis that would put the costs of cleanup under the 1984 Aetna gradual environmental impairment liability policy. During the course of Helm's testimony, First State made offers of proof tending to show that Aetna was mistaken when it treated the EPA's September 25, 1984 PRP letter as a "claim" under the 1984 Aetna gradual environmental impairment liability policy. In this context it should be noted that First State dropped its allegations that Kayser-Roth and Aetna had engaged in some form of collusion in order to place the EPA claim under that policy. There is no direct evidence that Aetna acted in anything but good faith in assigning the claim to its 1984 gradual environmental impairment liability policy 01 AL 482897 SCA.[3]
Nor does the circumstantial evidence support such a conclusion. One would have to draw the inference largely from First State trial exhibit YY, would have to find against Peter Butler's credibility concerning the industry use of retrospective agreements, and would have to ignore the Aetna letter which is Kayser-Roth trial exhibit 363.
Ted Mangano testified. He was a risk manger for Kayser-Roth in 1979. At that time the Kayser-Roth insurance department was small, consisting of just Mangano and a secretary. Mangano was responsible for administering the Gulf + Western insurance program for Kayser-Roth. Gulf + Western had its own separate insurance department in 1979. According to Mangano, Peter Butler was in that department. Mangano was involved in notifying Kayser-Roth's lower level insurance carriers of the Langelier
suit. Those carriers were notified of that suit in 1981. His testimony was credible.
John Orgain testified. Portions of his testimony were presented by First State and some were presented by Kayser-Roth. He is employed by Collins Aikman. Collins Aikman, a subsidiary of Wickes Companies, Inc., is now the owner of Kayser-Roth. Orgain is an attorney. He became involved in this litigation in 1994. He prepared Kayser-Roth's answers to interrogatories. As legal counsel to Collins Aikman, Orgain was familiar with the claims which have been paid out under the 1984 Aetna gradual environmental impairment liability policy 01 AL 482897 SCA.
John Orgain's testimony led to a brief adjournment in the trial so that the parties could take the deposition of Glen Milham. Milham was a manager in the Aetna home office claim department. He testified credibly to something which should have been readily stipulated to by the parties given the history of the EPA claim and this litigation. That is, that the 1984 Aetna policy had a $2 million dollar limit per claim and a $6 million dollar aggregate limit, that more than $6 million dollars in claims had been registered by Aetna against the policy, and that $1,497,121.00 was paid out on the Stamina Mills EPA claim before the aggregate limits were exhausted.
First State called Orgain in an attempt to examine him on his answers to interrogatories propounded by the other settling carriers. Orgain, as the Court noted earlier, was the attorney who responded to the discovery requests made of Kayser-Roth by the various insurers joined by INA in this action. Some of the discovery requests sought the factual and legal analysis behind Kayser-Roth's alternate theories or contentions that the Stamina Mills contamination should be covered by the ninety or so policies thrown into play in this litigation by INA's original complaint. The information provided in response to the interrogatory questions was not based on Orgain's firsthand knowledge but, rather, upon multiple hearsay. Much of the information was derived from Orgain's general research or that of his company's legal counsel. The interrogatory answers were conclusory and set forth Kayser-Roth's various factual and legal contentions made in pursuing its claims against its insurance carriers and their policies or in responding to their assertions that they should not afford coverage. The content of the interrogatory answers was far beyond the scope of Orgain's direct testimony and the testimony was offered in the context of First State's case in chief. Counsel for First State characterized his examination as a cross-examination. It was not, however, established at any time that Orgain's recollection needed to be refreshed by the statements contained in the interrogatory answers and there was no statement which Orgain made at trial which was shown to be inconsistent when juxtaposed with the statements contained in the interrogatory answers. Nor were the interrogatory responses offered as admissions, factual or judicial. Judicial estoppel had been briefed by the parties prior to trial and was not being asserted. Without regard to the rules of evidence, counsel for First State asserted what he described as his absolute right to examine a witness concerning the witness' statements made under oath. Counsel identified Orgain's interrogatory answers and testimony concerning the source of his information in providing those answers as being offered to demonstrate that there may be other insurance potentially covering the EPA claim, as evidence relevant to First State's known-loss defense, as evidence that Aetna was legally and factually mistaken when it registered the EPA claim against its 1984 gradual environmental impairment liability policy and paid out on that claim, and as evidence that the Stamina Mills spill was more properly covered by general comprehensive liability policies and not the 1984 Aetna policy and the First State policy.
The contents of these discovery materials and the foray made into the source of the legal and factual contentions contained in those materials did not assist the Court in making its findings of fact. For example, the effort to induce Orgain into a concession that the Langelier suit amounted to a 1981 environmental claim was not helpful. Nor did the Court find probative Orgain' s abandoned contentions that a number of Kayser-Roth' s primary comprehensive general liability insurances should provide coverage for the EPA loss. Contentions which in any event were barred from evidence by the preclusion order. The Court is not inclined to adopt the legal or factual contentions of the parties as a substitute for its own analysis of the legal issues and its own determination of what facts have been proved by the admissible evidence. Because there was no jury present, the Court gave First State some latitude in its inquiry of Orgain. Kayser-Roth's redirect of Orgain demonstrated the irrelevance of the conclusions sought by the interrogatories and the responses to those questions. The Court gave little weight to Orgain' s testimony. The Court declines to conclude from the various parties' alternative contentions, allegations, claims, and assertions that the facts relevant to the known-loss or other defenses and arguments have been indeed established. The facts in this case are not much disputed. It is for the Court to determine the legal significance of those facts.
Kayser-Roth presented several witnesses, the first of which was a local attorney, Deming Sherman. Sherman was a partner in the law firm of Edwards and Angell. Sherman testified that he was retained by Kayser-Roth when it was served by the EPA with a letter identifying Kayser-Roth as a party potentially responsible for the CERCLA based environmental remediation. Sherman testified that his objective was to convince the EPA that Kayser-Roth was not responsible for the acts of its former subsidiary. Sherman had only two years experience with CERCLA. That Act was newly enacted and it was not until 1982 that the EPA began enforcement actions in Rhode Island. At that time, the body of law applying and interpreting CERCLA was still in its infancy. Sherman relied on a Rhode Island state statute governing claims made against dissolved corporations as his guide in determining that Kayser-Roth could not be held liable under the federal Act. As incredulous as this belief may appear today, Sherman appeared to have genuinely believed Rhode Island state law would obviate the strict liability standard imposed by the United States Congress and the President of the United States. That, coupled with some general technical information concerning gravity and the downhill flow of groundwater, caused him to conclude that the EPA could not prove its case. The immediate effect of these very mistaken conclusions was that Kayser-Roth refused to conduct a remedial investigation or a feasibility study or perform the other actions requested by the EPA. The final result was that Kayser-Roth was successfully sued by the EPA for costs of cleanup which are expected reach into the tens of millions of dollars. Sherman was credible and, notwithstanding that his assessment of the relevant law may have been poorly founded, the Court finds that he indeed did not perceive that Kayser-Roth faced a significant risk of having to pay the costs of remediation for the TCE contamination. The Court finds, however, that Sherman knew or should have known and, therefore, Kayser-Roth should have known, that Kayser-Roth faced some risk of being held liable for the CERCLA losses. Inexplicably, Kayser-Roth claims it was harmed when one of the carrier-parties to the instant suit hired Sherman's law firm to represent it in an unrelated matter and thus created a conflict of interest which prevented Sherman from representing Kayser-Roth in this case.
Sherman testified that he perceived the PRP letter, Kayser-Roth's trial exhibit 1065, as an implicit threat of suit. Sherman read the word "urgent" at the top of the PRP letter and astutely concluded that the EPA wanted a very swift response. He also gleaned that the EPA was attempting to notify Kayser-Roth of its potential liability for significant contamination. Sherman was credible when he testified concerning his belief that Kayser-Roth could not be held legally responsible for the remediation. As we now know, his analysis proved to be too facile and was erroneous but, nonetheless, he testified he believed it at the time. And it is unrefuted that he communicated his ill-founded opinion to Kayser-Roth. At Kayser-Roth's request, Sherman communicated with Kayser-Roth's insurance carriers in order to keep them informed about the claim. He testified that First State requested information from him concerning the EPA claim and that he provided that information. He also described First State's participation in meetings with himself and Aetna concerning the defense and appeal of the EPA suit. All of this evidence was credible and uncontroverted. The Court gave it weight.
Michael Powers testified. He was a director in excess claims for John Hancock Insurance Company at the time of his testimony. In 1986 he was employed by Cameron Colby Company ("Cameron 
Colby") in Boston, Massachusetts. Cameron Colby was an insurance agency handling claims for First State and other carriers. Powers was a claims manager and supervisor assigned to handle environmental claims. He handled claims for First State. Kayser-Roth's claim relating to the Stamina Mills site was one of the claims to which he was assigned. Powers testified that while he followed no particular procedure, he did investigate the claim. He attended at least one meeting hosted by Deming Sherman and at which an Aetna representative was in attendance. The exhibits disclose that First State identified the date of loss for the EPA claim as September 19, 1984. Powers' recollection was that First State followed Aetna's choice for the date of loss. Powers testified that he never changed the date of loss or concluded that the date of loss should be other than September 19, 1984. Powers was aware of the 1981 Langelier suit when he put the date of loss at September 19, 1984. In an internal memorandum in which Powers identified the date of loss as September 19, 1984, Powers also wrote that First State provided coverage under the '83/'85 policy. He described the First State policy as excess to the scheduled Aetna 1984 gradual environmental impairment liability policy 01 AL 482897 SCA. Other internal documents contain language by virtue of which First State acknowledges that its scheduled underlying policy is the same Aetna policy and that the claim was made during the policy period. These documents identify the loss as the EPA claim of September 19, 1984. The documents introduced in the context of Powers testimony are also consistent in their failure to assert a reservation of rights based on the date of the loss or to communicate to Kayser-Roth any disagreement over the date of loss. The exhibits disclose that First State reserved rights on a number of issues but not on the question of the date of loss. Powers' testimony is supported by the exhibits and stands unrefuted. The Court gave weight to his testimony and the exhibits. First State did not appear to have quarreled with the manner in which Aetna handled the claim.
John Shea testified. He worked for Cameron Colby in the 1980s. He also worked for First State's successor entity, ITT New England. He was involved in managing claims. Like Powers, Shea testified that Cameron Colby did not have a specific policies or claims manual. Shea testified that from 1985 to 1988 it was Cameron Colby's practice to review each and every claim for potential coverage or lack of coverage. Shea testified that it was the responsibility of a good claims handler to issue a reservation of rights letter informing the insured of a potential problem in coverage. Shea was not involved in the handling of the Stamina Mills claim or at least had no recollection of being involved in it. Shea's testimony was credible and the Court gave it weight.
William Teich's testimony was presented. At the time of his testimony he was employed by an ITT company but not the same ITT company which is now successor to First State. He was director of excess claims including environmental claims files. He testified that First State and its successor entity had their own environmental claims department. In 1992 he became involved in the Stamina Mills claim. It was in 1992 when his company took over the consolidated claims handling for the ITT companies including claims handling for First State. He described typical claims handling procedures which included an analysis of the policy, an investigation of the claim and, for excess policies, some contact with the underlying earner. Teich authored Kayser-Roth trial exhibit 858, a memorandum. In that memorandum, Teich wrote: "we maintain the date of loss as 1984 as that is when the insured received their PRP letter. We are continuing to litigate our involvement at this site and have resisted any payments as to this site." Teich's testimony was not controverted and the Court gave it weight as credible.
The testimony of Edward Clark was introduced. He was identified as the person with most knowledge of the information requested in a subpoena issued by Kayser-Roth against First State. Clark was, at the time of his testimony, an employee of ITT Hartford which is it the parent to the successor entity to First State. Clark testified that First State is involved in several hundred coverage disputes where it is sitting as the excess or umbrella carrier. Clark testified that it was First State's practice to determine whether impairment or exhaustion existed at the underlying level. This assists First State in assessing its exposure and in setting its reserves. Sources include its own investigation, the policy holder, and the underlying carrier. Clark was an evasive witness but it became clear that the First State practice is to rely heavily on the underlying carriers' account of its payouts when First State sets its reserves.
Kayser-Roth presented one rebuttal witness, David Berg. Berg is a claims consultant to Aetna. He has worked for Aetna since 1966. He identified an interoffice memo he received from his superior, Glenn Milham. In the memo, Milham requested that Berg change the classification of the Stamina Mill claim. The memo included a request to change the name of the claimant. Berg confirmed that he most likely would have followed his superior's instructions in changing the claim class letter for the 1984 EPA claim. It was to be changed from "Langelier" to U.S. EPA. Berg's testimony was uncontradicted and credible.
The Court finds that for its internal claims handling purposes, First State and its agents treated the Stamina Mills claim as having been made in 1984. Other than the fact that it has not been paid on the First State policies and has had to litigate this action, there is no evidence that Kayser-Roth changed its position or was prejudiced as a result of its reliance upon the manner in which First State approached the claim. Nor is there sufficient evidence to persuade the Court that First State at any time intended to relinquish any legal right to deny coverage should it believe it was entitled to do so. The evidence demonstrates, however, that First State was aware of the manner in which Aetna would be handling the claim and that it did not object.
As the Court has indicated, the evidence in this case is consistent and not much seems to be genuinely disputed. Certainly there is a dispute between these parties concerning the legal significance of the facts but there is little contest about what took place and when.
 III The First State Policies
The Court will now turn to the insurance policies themselves. In addressing each, the Court will set out additional findings of fact as necessary and will state its conclusions of law.
By its cross-claim against First State, Kayser-Roth seeks to recover under both the '82 policy and the '83/'85 policy. As such, Kayser-Roth had the burden of convincing the Court by a fair preponderance of the evidence (1) that the policies existed and were valid, (2) that it complied with the policies' conditions, (3) that its losses fell within the policies' coverage, and (4) that First State refused to make payments as required by the terms of the policies. For those policies for which Kayser-Roth made out a prima facie case, First State then had the burden of proving the applicability of policy exclusions and limitations, or other legal doctrines, in order to avoid or reduce an adverse judgment. General Accident Insurance Co. ofAmerica v. American National Fireproofing, Inc., 716 A.2d 751, 757 (R.I. 1998). See also 19 Couch on Insurance 2d §§ 79:3 15 :319, at 255-56, 261 (1983). of course, whether coverage exists for a particular damage-causing event or claim depends first and foremost upon the plain, ordinary, and usual meaning of the precise terms and conditions of the policy in question. Textron,Inc. v. Liberty Mutual Ins., 639 A.2d 1358, 1362 (R.I. 1994). Furthermore, the Court cannot depart from the literal language of a policy absent a finding that it is ambiguous — that is, that it is susceptible to more than one reasonable meaning after having been read in its entirety with each word given its plain, ordinary, and usual meaning. If a policy is ambiguous, then the policy must be strictly construed in favor of the insured and against the insurer. Employers Mutual Casualty Co. v. Pires,723 A.2d 295, 298 (R.I. 1999).
Preliminarily, both policies have been admitted into evidence and the parties have stipulated that they are genuine and authentic and that Kayser-Roth paid the premiums for those policies. Furthermore, Kayser-Roth is a named insured under each policy by virtue of the policies' endorsement number one, which confers such a status on any subsidiary of Gulf + Western. As such, the parties have stipulated that Kayser-Roth is a real party in interest and has standing to sue. The Court will next consider otherwise the trial of each policy in turn.
 A. The '82 Policy 1. Conditions of Coverage
As previously noted, the first policy is styled as an umbrella liability policy, number 950506, covering the year 1982. In their February 13, 1996 Joint Stipulation of Facts, Kayser-Roth and First State stipulated that all conditions to coverage under the '82 policy had been satisfied except for First State's contention that the "OTHER INSURANCE" provision contained in that policy had not been satisfied and that paragraphs 1 and 9 of Aetna Policy 01 AL 482811 SCA and paragraph 1 of Aetna Policy 01 AL 482855 SCA were conditions that had not been satisfied.[4]
Notwithstanding the parties' stipulation, the Court deems it profitable to address some of the conditions which have been at issue — albeit nonfacially — during this lengthy litigation. It is also profitable to distinguish those matters that are true conditions of coverage for which the insured, Kayser-Roth, had the burden of proof.
First, the '82 policy required that whenever the director of risk management of Gulf + Western had information from which they may have reasonably concluded that an occurrence covered under the policy involved injuries or damages which, in the event that Kayser-Roth should be liable, was likely to involve the policy, notice had to be sent to First State as soon as practicable. However, the '82 policy provided that it was not prejudicial to fail to give notice of an occurrence which at the time of its happening did not appear to involve the policy but which later appeared to give rise to claims. Furthermore, during the course of the trial First State confirmed that it had dropped its notice defense. Compliance with notice requirements has been generally held to be a condition precedent to coverage, the burden of proof for which lies with the insured. See generally 19 Couch on Insurance 2d § 79:429, at 381-84 (1983) ("[t]he burden of proving proper notice and proofs of loss within a reasonable time, or within the time limited in the policy, or an excuse for failure to do so, is upon the insured"); Appleman, 21 Insurance Law and Practice § 12307, at 379 (1980) ("[t]he burden of proof is upon the plaintiff to establish compliance with policy requirements as to notice of loss or a waiver thereof'). But see
19 Couch on Insurance 2d § 79:430, at 385 (1983) ("[w]here a notice of the claim is not a condition precedent to recovery, the defendant insurer has the burden of proving the plaintiffs failure to give notice").
The '82 policy also provides that no action shall lie against First State unless Kayser-Roth shall have fully complied with all terms of the policy nor until the amount of its obligation to pay shall have been finally determined by judgment entered against it after actual trial. There is no dispute that Kayser-Roth's liability has been finally determined by judgment against it after actual trial in the case of United States of America v.Kayser-Roth Corp., 724 F. Supp. 15 (D.R.I. 1989). In addition to awarding the United States a monetary judgment, the federal district court also entered a declaratory judgment holding Kayser-Roth liable for future response and remediation costs related to both on-site and off-site cleanup. The district court's determination was later upheld on appeal to the First Circuit, which found that the district court did not err in finding that Kayser-Roth was an operator and in holding it liable for the costs of the cleanup. United States of America v.Kayser-Roth Corp., 910 F.2d 24 (1st. Cir. 1990). Even without the stipulation, the Court would have thus been persuaded that Kayser-Roth satisfied the final-determination aspect of this condition — assuming it was a condition for which it carried the burden of proof. See generally Appleman, 21 Insurance Law and Practice § 12309.35, at 387 (1980) ("[w]here the obtaining of a judgment against an uninsured motorist is a condition precedent to recovery on the policy, the burden is on the claimant to prove a valid judgment"). Whether Kayser-Roth has adequately shown full compliance with all the conditions of the '82 policy must necessarily await the Court's decision today.
Provision L of the '82 policy, entitled "MAINTENANCE OF AND RESTRICTIONS IN UNDERLYING INSURANCES," provides that the policies of insurance itemized in the attached "SCHEDULE OF UNDERLYING INSURANCE" ("the schedule") shall be maintained in full effect during the policy period without reduction of coverage or limits. The only scheduled policy having relevance[5] to provision L is Aetna Policy 01 AL 482804 SCA, which appears on the first page of the schedule and is identified as a comprehensive general-liability insurance policy having a one million dollar single limit for each occurrence. This policy has not been put into evidence and its specific terms are thus unknown. Although the '82 policy is, by its terms, excess to the scheduled underlying policies, including this Aetna policy, the '82 policy language also explicitly provides that the insured's noncompliance with the requirement that the scheduled underlying insurance policies be maintained is not fatal to coverage but rather renders First State liable to pay only to the extent it would have had the insured complied. By their Joint Stipulation of Facts, however, the parties agree that the maintenance of this policy is a condition of coverage which has been satisfied. Moreover, Kayser-Roth has agreed that it is willing to treat the '82 policy coverages as excess to the Aetna policy limits notwithstanding the preclusion order and First State's resulting inability to prove that the Aetna policy in fact affords coverage for the EPA claim. Because First State's liability is, as the Court will address momentarily, excess of the scheduled underlying limits or excess of the first $100,000.00 of ultimate net loss should the underlying scheduled insurance policies not provide coverage, First State may well have received a windfall as a result of Kayser-Roth's agreement. From the description contained in the schedule, the Aetna comprehensive general liability policy is occurrence based which could have required that the triggering occurrence take place during the policy period. But First State has long contended, in the alternative to other of its arguments, that the Aetna policy language precludes coverage for the spill. If that were the case, then the Aetna policy would not afford coverage and First State's liability, under the "LIMIT OF LIABILITY" provision of the '82 policy, would "drop down"[6] to the excess of the first $100,000.00 of ultimate net loss. Given that the EPA claim is expected to reach into the tens of millions of dollars, however, the windfall created by Kayser-Roth's largess may soften into a gentle breeze.
 2. Other Insurance
The Court will now turn to provision E, the "OTHER INSURANCE" clause, of the '82 policy. The '82 policy format places this language in the policy section entitled "THIS POLICY IS SUBJECT TO THE FOLLOWING CONDITIONS." The "OTHER INSURANCE" provision of the '82 policy requires that First State's liability "shall be excess insurance over any other valid and collectible insurance available to [Kayser-Roth] . . . and applicable to any part of [the] ultimate net loss, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the limits of liability provided in this policy." This provision places First State excess to all other of Kayser-Roth's insurance policies in addition to those itemized in the schedule and required to be maintained under the maintenance provision. However, First State is excess to them only to the extent that they actually afford coverage in that they are "valid and collectible," are "available" to Kayser-Roth, and are "applicable" to the loss in question.[7] Where there are other insurances containing competing other-insurance provisions, the question becomes one of contribution and the insured's losses will be apportioned among the carriers. 44 Am.Jur.2d Insurance § 1791, at 779 (1982); Hindson v. Allstate Insurance Co.,694 A.2d 682, 685 (R.I. 1997) ("any conflicts between such other-insurance clauses should be resolved by construing them as mutually repugnant and therefore unenforceable" and the loss prorated).
Although the effect of the "OTHER INSURANCE" clause is clearly to reduce the amount of liability, First State contends nonetheless that as part of Kayser-Roth's burden of proving it was entitled to coverage, Kayser-Roth must prove what other of its insurance policies covered the Stamina Mills claim. It is First State's position that before Kayser-Roth can make out a prima facie case that it is entitled to coverage, and as part of its burden of proving that all of the conditions precedent to coverage have been met, Kayser-Roth must prove the extent to which First State's coverage will be excess to any other insurance policies providing coverage for the Stamina Mills claim. First State contends that Kayser-Roth has failed to make out a prima facie case that it is entitled to excess coverage and, at the least, has failed to show at what point that excess coverage should begin. Consistent with that contention, and partly in order to demonstrate Kayser-Roth's failure of proof in this regard, First State unsuccessfully offered as evidence a number of policies of insurance and a coverage chart which purports to schedule all of the insurance which has at one time or another been alleged to be potentially responsive to the EPA claim.[8] For present purposes the Court can presuppose that these policies and the coverage chart were not precluded from the Court's consideration by the pretrial preclusion order and that the policies and the chart were admitted in full. The Court can make this presupposition for the simple reason that neither party introduced or offered the proof which would enable the Court to determine which, if any, of these one hundred or so policies was indeed valid and collectible, available to Kayser-Roth, and applicable to the Stamina Mills loss. Had these polices and the coverage chart been introduced in spite of the preclusion order, their only effect would have been to demonstrate that there may
be other insurance policies to which First State's liability should be excess.
The Court will briefly expand upon this. It is not disputed, and the general record in this case will show, that there were dozens of other policies of insurance that the various litigants have claimed should cover the Stamina Mills loss. With the exception of Aetna, and even then with regard only to its 1984 gradual environmental impairment liability policy 01 AL 482897 SCA, all of the carriers denied coverage under their policies. Which of these many policies were legally valid, actually collectible, and ultimately available to Kayser-Roth to provide coverage for the EPA claim has never been conceded by the various carriers and cannot be determined from the trial evidence. Kayser-Roth has assiduously avoided introducing evidence upon which the Court could make findings of fact or conclusions of law concerning any particular policy except for the '82 and '83/'85 First State policies. So, too, Kayser-Roth has held the Court and First State to the preclusion order which kept First State from giving proof of the existence of other policies of insurance. To be sure, First State attempted to demonstrate through John Orgain and Kayser-Roth's broad and conclusory contentions that all of the other carriers' policies at issue in this action were valid, collectible, provided coverage and so on. But, as counsel for First State indicated at the time of Orgain's testimony, this was not so much an effort to prove that Kayser-Roth in fact had collectible coverage under any one of these policies as it was an attempt to demonstrate how poorly Kayser-Roth had fared in its attempt to make out a prima facie case in regard to the "OTHER INSURANCE" provision of the First State policies. Beyond this, however, First State has done little toward proving that which is necessary to demonstrate which of the numerous policies contained in its proposed exhibits are in fact valid, that is, not rendered illegal through misrepresentation or fraud or not rendered void on account of some legal doctrine and that they are in fact collectible or that their coverages are in fact available to Kayser-Roth. First State contends that Kayser-Roth has the burden of proof on this condition of coverage. The record of this case, including the trial record will disclose that neither First State nor Kayser-Roth were earnestly attempting to prove that which would be necessary for the Court to determine the validity, collectability, and applicability of any one of the numerous policies over which this suit was brought so much as they were attempting to demonstrate that it was the other's job to do so. Understandably, neither wanted the burden of proving that these other insurance policies provided coverage but both would like to take advantage of the other's failure to meet that burden. Even assuming First State's proof in this regard, as offered, had been admitted into the body of evidence at trial, there is not enough other evidence that would allow the Court to draw the necessary conclusions concerning the elements of validity, collectability, applicability, and availability of coverages under each of the policies identified by First State and offered into evidence. Furthermore, what law should be applied to the various policies' different provisions was a standing source of contention throughout this litigation and there is not enough trial evidence that would allow the Court to make the necessary choice-of-law or conflict-of-laws analysis for the issues raised by these policies.
The practical effect of First State's contention is certainly curious. First State would require that before coverage is triggered, its insureds must successfully prove the limitations on or reductions in First State's liability. In other words, as a condition precedent to coverage, the insured must prove how little its carrier must pay in damages. The more successful the insured becomes in its proof that it is entitled to coverage, the less First State will have to pay. One wonders what would be the result if the insured took on the burden but failed in its proof that some particular policy of other insurance was valid, collectible, available, and applicable to the loss? Are the conditions of coverage under the First State policy deemed proved or not? What if First State were to take the position that the insured could have done a better job at proving the other policy? Or what if the insured did not believe a particular policy to be valid, collectible, available, or applicable but First State disagreed with that contention? Is the insured required to expend effort in proving what amounts to a limitation on the coverage it seeks in order to protect its right to that coverage? And, in a case where there are several policies potentially afford concurrent coverage, isn't the insured, as a practical matter, being required to prove First State's pro rata share? And which of the litigants carries the burden of proving the policy exclusions, limitations, or other defenses to coverage or to liability for damages? For example, if the carrier issuing the other policy of insurance refused to pay by claiming the policy was procured by fraud and misrepresentation, is it First State or its insured that must prove that policy defense? Or should the insured attempt to prove both its right to coverage as well as its own fraud? The bugaboo of conflicts and confusion presented by First State's contention concerning burden of proof of other insurance grows exponentially.
Kayser-Roth argues that it does not bear the burden of proof on any of the issues concerning the scheduled underlying policies or other insurances. Kayser-Roth contends that it is First State's burden to prove the existence of any underlying or concurrent insurance upon which First State relies to defeat or reduce its liability. The threshold question, of course, must be whether the "OTHER INSURANCE" clause of the '82 policy is to be treated as a condition of coverage for which the insured carries the burden of proof or is it a limitation on liability for which the carrier has the burden of proof. Initially, the Court notes that the fact that this provision was placed within a section of the policy characterized as conditions is not dispositive of its effect. Moreover, by its wording, the "OTHER INSURANCE" clause indicates that it comes into effect only after a determination has been made as to whether the '82 policy provides coverage. If it does, then the other insurance must be gauged. And if it does not, then other insurance is irrelevant. It simply makes no sense to consider other insurance before considering whether the '82 policy itself provides coverage. The Court thus concludes that the "OTHER INSURANCE" clause is not a condition of coverage for which the insured carries the burden of proof. See generally 19 Couch on Insurance 2d § 79:434, at 386 (1983) ("[am automobile liability insurance insurer claiming that it carried only excess insurance over other valid and collectible insurance . . . has the burden of establishing the existence of other collectible, primary insurance"); Appleman, 21 Insurance Law and Practice § 12246, at 295 (1980) ("[t]he burden of proof is upon the insurer to establish the existence of concurrent insurance, where relied upon either to defeat or reduce liability"); Robert E. Keeton, Basic Text on Insurance Law § 3.11 (1971).
 3. Broad as Primary Endorsement
In the parties' Joint Stipulation of Facts, First State contends that paragraph 1 of Aetna Policy 01 AL 482855 SCA and paragraphs 1 and 9 of Aetna Policy 01 AL 482811 SCA are conditions precedent to coverage under the '82 policy and that those conditions have not been satisfied. Neither of the Aetna policies are in evidence and the '82 policy does not specifically require that any provision contained in the Aetna policies be considered as a condition precedent to coverage under it. The '82 policy does, however, contain an "ENDORSEMENT NO. 4," entitled "BROAD AS PRIMARY," which provides that
 It is agreed that in the event of a loss for which the Insured has insurance policies, the excess of which would be recoverable hereunder except for terms and conditions of this policy which are not consistent with such insurance policies, then notwithstanding anything contained herein to the contrary, this policy shall be amended to follow the terms and conditions of such insurance policies in respect of such loss.
It has been First State's contention throughout this litigation[9] that the broad-as-primary clause ought to be construed as essentially providing that the '82 policy is amended such that it "follows form"[10] to the terms and conditions of those of Kayser-Roth's other insurance policies to which the '82 policy is excess. In other words, the terms and conditions set forth in the '82 policy have been supplanted by the terms and conditions contained in the Aetna policies. That being the case, argues First State, Kayser-Roth's burden is to prove the terms and conditions appearing within the language of the underlying policies rather than the terms and conditions appearing in the '82 policy. Having been amended, the language appearing in the '82 policy is irrelevant, contends First State. From there, First State contends that Kayser-Roth has failed to make out a prima facie case that it is entitled to coverage because it has failed to prove the terms of these two Aetna polices to which it says the '82 policy follows form. It hopes thus to shield itself from providing coverage by substituting the Aetna policies' narrower language for its own. The Court rejects First State's contentions that its policy follows form to the two Aetna policies.
Nothing in the '82 policy, including the broad-as-primary clause, incorporates the terms of any other policy such that the '82 policy's terms would be changed to conform to those contained in that other insurance. See generally Employers Mutual CasualtyCo. v. Pires, 723 A.2d 295, 298 (R.I. 1999) ("[w]e will not depart from the literal language of the policy absent a finding that the policy is ambiguous"). Nor does the '82 policy rely in whole or in part on the terms and conditions of any other policy. On the contrary, the '82 policy is replete with the terms, conditions, exclusions, and other language necessary to independently govern the rights and obligations of the parties to it. Furthermore, the clear and unambiguous language of the broad-as-primary clause is applicable only when the excess coverage under the '82 policy is impaired due to some conflict with the underlying policy covering the loss. It is only then that the broad-as-primary clause resolves the conflict by broadening the '82 policy's terms and conditions so as to allow excess coverage in spite of the conflict. The obvious effect of the broad-as-primary clause is to provide for coverage whenever the terms and conditions of the '82 policy are in conflict with the underlying coverage such that First State's obligation to afford excess coverage could otherwise be avoided. The clause is designed to benefit the insured by providing them expansive
protection when dueling policy terms interfere with the availability of excess coverage. First State's contrary belief that the broad-as-primary clause narrows the terms of the coverage afforded by the '82 policy is simply mistaken and unsupported.
The Court concludes that the terms and conditions applicable here are those set forth in the First State policies themselves, not elsewhere. Therefore, paragraph 1 of Aetna policy number 01 AL 482855 SCA and paragraphs 1 and 9 of Aetna policy number 01 AL 482811 SCA were not conditions of coverage which Kayser-Roth must have satisfied.
 4. Trigger of Coverage
Having determined that Kayser-Roth satisfied the conditions of coverage for which it carried the burden of proof, the Court now turns to the insuring agreements.
The first question is the extent to which Kayser-Roth's loss at the hands of the EPA was a risk the '82 policy insured against. The applicable policy language appears on page 1 and is entitled "COVERAGE." That language is tied to the "LIMIT OF LIABILITY" provision set forth in the Declarations pages and on page 2. The '82 policy provides that First State will pay Kayser-Roth's ultimate net loss in excess of the recoverable underlying limit which Kayser-Roth becomes obligated to pay as money damages because of property damage to which the policy applies and that is caused by an occurrence. Property damage is defined as any damage including physical injury to and loss or destruction of tangible property. There is no dispute that the TCE contamination rendered the mill site, the local water supply, and neighboring properties damaged by and in 1982. The policy is, therefore, implicated as a matter of law so long as there has been an occurrence.
This brings us to the next question which is whether the events causing the property damage at issue in this case meet the policy definition of an occurrence. That is, whether an accident, happening, or event, or a continuous or repeated exposure to conditions, resulted in property damage that Kayser-Roth neither expected or intended. The language of this policy, which is agreed to be that of First State, does not require that the accident, happening, or event take place within the policy period. Nor does it require that the property damage take place or manifest itself within the policy period. Nor does it appear to require that, for the purposes of defining an occurrence, the damaged property belong to the third party to which the insured may be held liable. Indeed, the policy language defines property damage as any damage to tangible property. While damage to the insured's property may be excluded from coverage once that coverage is triggered, and while First State's liability may be limited to damages incurred on account of harm suffered by third parties, for purposes of determining whether and when the policies' coverages are implicated in the first instance, property damage may arguably be "any" damage to tangible property.
There is no dispute that the spill which took place in 1969 was accidental. Further, the parties have stipulated that Stamina Mills was not at fault. As such, the Court finds that the property damage caused by the spill was unexpected and unintended from Kayser-Roth's standpoint. Moreover, based upon the evidence, the Court finds, as it has indicated earlier in this decision, that the property damage resulted from an occurrence that took place sometime within the time frame bounded by a few months after the spill and, at the outside, the end of 1981. While that may not determine the date of the occurrence with much particularity, it is sufficient under the '82 policy because, unlike the policy at issue in CPC International, Inc. v.Northbrook Excess Surplus Insurance Co., 668 A.2d 647 (R.I. 1995), the '82 policy does not require that the occurrence cause property damage during the policy period. To that extent, then, the '82 policy resembles a claims-made policy. But the '82 policy also resembles an occurrence policy because it does not require that the claim first be made during the policy period. This creates the potential of coverage for an occurrence that took place during the pre-policy period and on a claim that was made during the post-policy period. This result is but a function of the '82 policy's highly unusual hybrid nature. However, because there is no principle that condemns on public policy grounds coverage that combines elements of both claims-made and occurrence policies but provides less protection than is customarily afforded by either, the Court concludes that the '82 policy's coverage provisions, which provide more coverage than either type of policy alone, fell within the broad parameters allowed to parties to contract as they desired. Textron, Inc. v.Liberty Mutual Ins. Co., 639 A.2d 1358, 1366-67 (R.I. 1994). Because there is no requirement that the occurrence occur within the policy period, the only occurrences that would seem not to be covered by the '82 policy would be post-policy-period occurrences.
Contrary to the parties' intimations and trial stipulations, the Court finds that there was but one occurrence and, consistent with First State's intimations, the Court likewise finds that it took place no later then in 1981. The Court has reached those conclusions, mixed of fact and law, for the following reasons. Our high court held in CPC International, Inc. that "coverage under a general liability policy is triggered by an occurrence that takes place when property damage . . . manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." 668 A.2d at 650. Moreover, the law in Rhode Island is that the dissemination of contaminants, through seepage, for an undetermined number of years constitutes a continuous or repeated exposure to conditions resulting in property damage; however, such continuous activity constitutes only one occurrence for purposes of an insurance policy. Truk-Away of Rhode Island,Inc. v. Aetna Casualty Surety Co., 723 A.2d 309, 313 (R.I. 1999). Even if the Court were inclined to discount as manifestation, contrary to its earlier finding, the sweet-water reports made by Stamina Mills employees just a couple of months after the spill, and even if the Court were inclined to discount as discovery the 1979 Rhode Island Department of Health testing which revealed elevated levels of TCE in the surrounding neighbors' wells, the Court would be hard-pressed to conclude that by the time the Langelier action was filed in 1981 Kayser-Roth could not have discovered the damage in the exercise of reasonable diligence. of course, Kayser-Roth must have had some reason to test for contamination. See Textron, Inc. v. AetnaCasualty and Surety Co., 723 A.2d 1138, 1144 (RI. 1999). But even when discounting Gulf + Western's history of EPA involvement and environmental impairment claims, the Court finds that in the aggregate, the spill, the sweet taste to the water, the discovery by the Department of Health of elevated levels of TCE, and the filing of the Langelier suit would cause a reasonable person exercising reasonable diligence to test for, and discover, soil and groundwater contamination. Therefore, the Court finds that the occurrence took place at the latest shortly after the filing of the Langelier action in February 1981. This finding is consistent with First State's proposed finding of fact that Kayser-Roth's executives knew of the 1969 TCE spill and the resulting on-site and off-site groundwater contamination by at least 1981, knowledge which buttresses the reasonableness of finding that Kayser-Roth had some reason to test for contamination.
First State also contends that its policies are not triggered because the damaged property was owned by its insured. This contention, of course, goes to the distinguishing feature between third-party liability insurance and first-party insurance. It is true that Kayser-Roth's prior status as an owner/operator of the Stamina Mills site brought it legal responsibility for the damage producing event. It is also true that a component of the harm caused by the spill included harm to Kayser-Roth's property. But the view that the TCE contamination is not damage to the property of others is myopic in that it ignores the impartible nature of environmental damage and the representative capacity of the United States EPA. That the source and site of the damage may have once belonged to Kayser-Roth does not alter the essential nature of Kayser-Roth's liability, that is, liability to a third party as a result of damage to property. Generally, courts have not hesitated, in the context of third-party liability insurance, to treat damage to the environment as property damage for the purpose of triggering coverage. See generally 2 Holmes's Appleman on Insurance 2d § 9.6, at 544 (1996) ("In looking at the ways courts liberally construed terms in pollution situations, some courts have found coverage for costs incurred by the insured in cleaning up contaminated groundwater caused by . . . the release of other hazardous substances where the court held that such costs constituted covered `property damages.'").
That the law requires Kayser-Roth to conduct a remediation of the damage-causing condition and to reimburse the EPA for its costs goes to the remedy for the harm caused and not the nature of Kayser-Roth's liability for that harm. It is precisely for the purpose of discharging its liability to the EPA that Kayser-Roth has been ordered to remediate the environmental damage and to reimburse the EPA for its costs. The trial evidence is that the TCE spread throughout the adjacent areas and would have continued to do so absent the remediation effort. And, the United States Federal District Court in United States v. Kayser-Roth Corp.
found that the relationship between the TCE concentrations on the Stamina Mills property and the plume of migrating contamination infiltrating the neighborhood were the cause of pollution. It further determined that the releases from the Stamina Mills site were the cause of both the on-site and off-site response and remediation costs. Having had the obligation and opportunity to defend Kayser-Roth in that case, but having declined to do so, First State is not in a position to argue that a distinction should be made between "on-site" and "off-site" damages and remediation costs. The fact of the matter is that it is in discharging its liability to the EPA that Kayser-Roth has been ordered to both remediate and reimburse.
As an alternative to its trigger-of-coverage argument, First State points to certain exclusions from coverage found in its policies as well as exclusions found in the policies issued by the other carriers to which First State, depending on the moment, contends it "follows form." First State argues that even if coverage under its policies is triggered, the policy language excludes from that coverage liability for damage to property owned by the insured. As with the trigger-of-coverage argument, the Court has concluded that to construe the First State policy language such that this damage is excluded from coverage because Kayser-Roth owns or owned the site upon which the source of contamination is located requires too narrow a construction.
Having determined that the property damage resulted from an occurrence, the Court concludes as a matter of law that the policy coverages are triggered.
 5. Limit of Liability
Having concluded that coverage under the '82 policy has been triggered, the Court will consider next the extent or limit of First State's liability on that policy. The "LIMIT OF LIABILITY" provision appears as Item 3 of the policy declarations. By the policy language, the amount of First State's liability is limited to $5 million dollars of Kayser-Roth's ultimate net loss, that is, the total sum which Kayser-Roth, and/or any company as its insurer, becomes obligated to pay by reason of property damage either through adjudication or compromise. That liability is specifically provided to be excess of the amount recoverable under the insurance as set out in the schedule or, if the underlying insurance policies do not afford coverage, of $100,000.00 of the ultimate net loss. First State's liability under the '82 policy for any one occurrence of property damage is limited to the ultimate net loss that is in excess, up to $5 million dollars, of the limits of the amounts recoverable under the underlying insurance policies set out in the attached schedule. Although there are many policies listed in the schedule, only one is in issue and that one reveals that First State's liability is excess of the one million dollars provided by the Aetna comprehensive general liability policy previously discussed. Therefore, First State's liability to Kayser-Roth under the '82 policy is for up to $5 million dollars in excess of the first million dollars of Kayser-Roth's ultimate net loss. Furthermore, because First State failed to prove that its '82 policy should be excess to other insurance policies applicable to this same loss, First State's liability to Kayser-Roth is excess only to that first million dollars represented by the Aetna limits.
 6. The Known-Loss Defense
Throughout this litigation and in its pretrial memorandum, First State claims as to both the '82 and the '83/'85 policies the defense of known-loss or loss-in-progress. First State looks to New York case law to determine the requirements of its known-loss defense and argues that the requirements for establishing such a defense were "clearly delineated in ParamountCommunications Inc. v. Gibraltar Cas. Co., et al., No. 25473/90, N.Y. Sup. Ct. (Dec. 3, 1992) ("Paramount")." The Paramount case provides that "[i]n order for a risk to be deemed `known, ' it is not necessary for the insured to know for certain that an event will happen if there is a substantial probability that an event will occur." After following First State's lead and applying the law as stated therein, the Court concludes that First State's known-loss defense fails.[11]
The distinction between the known-loss, known-event, known-risk, and loss-in-progress theories are sometimes blurred in the case law. At times the terms are used interchangeably notwithstanding that they are different doctrines and have different implications depending upon the context in which they are applied. Known loss, known event, known risk, and loss in progress are separate legal theories developed in the law to protect an insurer by voiding insurance contracts where the loss suffered by the insured is certain rather than fortuitous. Seegenerally 3 Holmes' Appleman on Insurance 2d § 16.4, at 290 (1998) ("[t]he known-loss doctrine is based on the fundamental principle that insurance is intended to cover risks that are not definitely and certainly known to the insured while theloss-in-progress doctrine provides that one cannot insure for a loss that already is in progress").
The known-loss doctrine is applied where the insured has knowledge, prior to the inception of the insurance policy, that the insured has indeed suffered an economic loss as a result of some event and that the loss is a certainty. See generally 3 Holmes' Appleman on Insurance 2d § 16.4, at 290 (1998) (the known-loss doctrine "applies only where the insured is aware of a threat of loss so immediate that it might be stated that the loss was already in progress and such was known at the time of application or issuance of the policy since this doctrine is designed to prevent fraud when coverage is sought to be misused to insure a certainty rather than a fortuity"). The known-loss doctrine is often called the "Known Event Rule" which, at least in the first-party insurance context, is a less confusing designation for this doctrine. The loss-in-progress theory contemplates that the insured is aware, at the time the insurance policy incepts, that the event itself is taking place and that the loss is a certainty. See generally 3 Holmes' Appleman on Insurance 2d § 16.4, at 290 (1998) ("the loss-in-progress doctrine only applies where the insured is aware of a threat of loss so immediate that it can be stated that the loss was in progress at the time the insurance was issued and applied for"). With both the known-loss and loss-in-progress doctrines the loss is certain and the event has occurred or is occurring. The risk of economic loss to the insured has become a certainty.
The known-risk theory has been equated with the loss-in-progress rule at times. The Court finds this to be unfortunate because this would imply that where a risk is known to exist or is identifiable then it is uninsurable. "Risk," however, implies a contingency. A contingency or risk is insurable even when it is known — absent some claim of misrepresentation or fraud (of which there is none here). The premise behind insurance is to protect an insured from the risk of certain types of losses so long as the loss in question is contingent at the time the policy incepts. Where the loss at issue is contingent and has not become a certainty then the loss remains insurable when the policy incepts. Only when the particular risk is such a certainty prior to the inception of the policy does it fall within the known-loss or loss-in-progress rule, rendering it uninsurable.
Some of the confusion over the so called known-risk theory seems to originate from the cases which do not distinguish between the first-party and third-party insurance settings. First-party insurance protects an insured against losses it suffers by virtue of some injury or damage to it or its property and which is caused by some event. Third-party insurance, such as is at issue in the instant case, protects an insured against losses it suffers if it is held liable for an injurious event which causes injury or harm or damage to a third party's property.
The critical distinction is the distinction between a "loss" and an "event." It is because of this distinction that, depending on the context, interchanging the terms "known event" and "known loss" can be misleading. In the first-party insurance context the economic loss to the insured generally takes place simultaneously with or about the same time as the injurious or damage producing event. In the third-party context the economic loss to the insured generally takes place at some point in time after the injurious event. It takes place if and when the insured is held accountable to the injured party. In the first-party context the operative event is generally the injurious event and the fact of the insured's loss is generally a given at the time of that event even though the specific value or dollar amount of the loss may not be immediately determinable. In the third-party context the operative event is generally the legal determination that the insured should be held liable or accountable for the injurious event. In the first-party context the fact of an economic loss to the insured is generally a certainty at the time of the event. In the third-party context the economic loss to the insured is generally not a certainty until the multitude of contingencies associated with a determination of liability are removed. The particular circumstances, including the specific language of the insurance policy at issue in any given case, will, of course, be expected to have an effect upon these general rules. In any event, it is the distinction between first-party and third-party insurance which is important because it requires that the Court focus on the precise nature of the event or loss, what it is that is known, and whether the loss is contingent notwithstanding that the injurious event might be known at the inception of the policy.
First State's policies unquestionably afford third-party coverage. Kayser-Roth is insured for economic losses it suffers as a result of its obligation to pay damages to others. While the injurious event is unquestionably the 1969 TCE spill which took place at the Stamina Mills site, the operative event for purposes of a "known-loss" analysis is the final disposition of Kayser-Roth's liability to the EPA.[12] The question is whether First State proved by a preponderance of the evidence that this particular economic loss — Kayser-Roth's liability to the EPA — was an eventuality that Kayser-Roth, prior to January 1, 1983, had knowledge would be substantially probable to come about. The Court finds that it has not.
It is not disputed that the injurious event, the spill, was an event known to Kayser-Roth at the time when the First State policies incepted. And, shortly after the spill, Kayser-Roth knew of the damage to its own property. The Court has found that by 1979 Kayser-Roth officials knew or should have expected that Kayser-Roth or a related entity was at risk of being sued for the harm done to the privately owned neighboring properties and caused by the spill. CERCLA was enacted in 1980. Then, in February 1981, Norman Langeher filed suit. During that same period of time, Gulf + Western insurance program managers were unquestionably aware that environmental impairment could generate some form of liability. The '82 policy incepted on January 1, 1982. The '83/'85 policy incepted on January 1, 1983. The EPA did not make a claim against Kayser-Roth for the Stamina Mills/Forrestdale cleanup until late 1984. Suit was not filed against Kayser-Roth by the EPA until 1988.
The Court, as earlier indicated, has found that Kayser-Roth officials did not in fact recognize that they risked liability or potential liability for remediation of the large-scale environmental damage caused by the Stamina Mills spill until September 1984 when the letter identifying Kayser-Roth as a Potentially Responsible Party was served by the EPA. Even assuming that Kayser-Roth or Gulf + Western officials should, reasonably, have known by 1981 that liability for environmental impairment had become a real threat to Gulf + Western's various operations including its former Stamina Mills site, the Court is not persuaded that, at the time the First State policies incepted, Kayser-Roth or Gulf + Western officials genuinely understood and appreciated what lay ahead of them with respect to this particular loss. To be sure, it was no later then 1981 that Kayser-Roth officials knew both that there had been an injurious event and that there may have been economic losses suffered by at least one third party, Norman Langelier. Furthermore, the spread of contamination was continuous and the injurious event had been in progress since 1969. However, prior to September 1984 the EPA had not asserted its claim and that claim, even once asserted in September 1984, was subject to the multiple contingencies associated with the determination of Kayser-Roth's liability. So, although the damage producing event was in progress and then known, the risk against which the First State policies insured, that is, liability to the EPA, remained unknown and unrecognized as a substantial probability. See generally Astro Pak Corp. v.Fireman's Fund Insurance Co., 665 A.2d 1113, 1116-17 (N.J. Super.A.D. 1995) ("If the prevention if fraud is at the heart of these rules, the `loss' must relate to a known occurrence that would trigger indemnification by the insurer. Only if plaintiff knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense. . . . The loss was still fortuitous here in that Astro Pak had not been aware of its own potential liability when The Hartford's policies were written."); 3 Holmes' Appleman on Insurance 2d § 16.4, at 312 (1998) ("[c]learly, where the policy period commenced after the state or federal government filed an environmental complaint against the insured, no coverage could be had thereunder"). The evidence is that during the period 1979 through 1983 Kayser-Roth did not know how many claims, if any, would materialize, what the nature of those claims would be, nor whether there was a substantial probability that any one of those claims would indeed result in Kayser-Roth's liability. Furthermore, it is the Court's conclusion from the evidence and the reasonable inferences that can be drawn therefrom, that Kayser-Roth did not know of or begin to suspect that a loss at the hands of the EPA could be a substantial probability until that point in time when the federal courts began to reject the arguments and defenses Kayser-Roth's attorneys advised it to rely upon.
 7. '82 Policy Conclusion
First State did not argue any exclusions applied to the '82 policy. Rather, it relied on its determination that Kayser-Roth failed to demonstrate a prima facie case of coverage and upon its known-loss defense. Having determined contrarily that Kayser-Roth indeed made out a prima facie case of coverage under the '82 policy, and having found that First State failed to prove its known-loss defense, and it being clear that First State has not paid under this policy, the Court concludes and declares that Kayser-Roth has proven that it is entitled to coverage under the '82 policy for its ultimate net loss in excess of one million dollars, up to a total of $5 million dollars.
Having concluded its analysis of the '82 policy, the Court now turns to the trial of the '83/'85 policy.
 B. The '83/'85 Policy 1. Conditions of Coverage
Like the '82 policy, the '83/'85 policy is styled as an umbrella liability policy. Moreover, the format and language of the two policies are nearly identical. Indeed, from the designation appearing in the upper left-hand corner of the Declarations page, it appears that the '83/'85 policy is a renewal of the '82 policy.
In their Joint Stipulation of Facts, Kayser-Roth and First State stipulated that the premiums were paid for the '83/'85 policy, that it was valid and in force, that Kayser-Roth was one of its insureds, and that all conditions to coverage under it had been satisfied except that First State contended that paragraph E (the "OTHER INSURANCE" clause) was a condition that had not been satisfied.
With respect to the conditions set forth on page 13 in paragraph L, entitled "MAINTENANCE OF AND RESTRICTIONS IN UNDERLYING INSURANCES," there are three relevant primary layer coverages. They are itemized on a "SCHEDULE OF UNDERLYING INSURANCE" ("the schedule") attached to the '83/'85 policy as Aetna policy 01 AL 482897 SCA, Aetna policy 01 AL 482895 SCA, and Continental policy L1512257. The first is identified on the schedule as a gradual environmental impairment liability (claims-made) policy having limits of $2 million dollars for any one claim and an aggregate limit of $6 million dollars. The second is identified on the schedule as a comprehensive general liability policy having single limits of one million dollars for each occurrence/claim/loss/etc. and an aggregate limit, if applicable, of $5 million dollars. While both policies are at issue in this case, neither is so by reason of any allegation that it has not been maintained. The Continental policy is identified as a comprehensive-general liability policy having limits of $500,000.00 for each occurrence. The parties do not identify the maintenance of this policy as being at issue.
The paragraph E "OTHER INSURANCE" provision of the '83/'85 policy does not differ from that contained in the '82 policy. The Court will not repeat its analysis of the issues raised by First State's contention in this regard. Given the Court's earlier determination that the other-insurance provision is not a condition precedent to coverage and that First State failed to carry its burden of proof with respect to the other-insurance provision of the policy, the Court concludes that all of the conditions precedent to coverage for which Kayser-Roth had the burden of proof have been met.
 2. Trigger of Coverage — The First State Policy Language
Having determined that Kayser-Roth has satisfied the conditions of coverage for which it carried the burden, the Court will now turn to the insuring agreements.
The first question is the extent to which Kayser-Roth's loss at the hands of the EPA was a risk the '83/'85 policy insured against. The applicable policy language appears on page 1 of the '83/'85 policy and is entitled "COVERAGE." That language is tied to the "LIMIT OF LIABILITY" provision set forth in the Declarations pages and on page 2 of the '83/'85 policy. The '83/'85 policy provides that First State will pay Kayser-Roth's ultimate net loss in excess of the applicable underlying limit which Kayser-Roth becomes obligated to pay as money damages because of property damage to which the policy applies and that is caused by an occurrence. Property damage is defined as any damage including physical injury to and loss or destruction of tangible property. There is no dispute that the TCE contamination rendered the mill site, the local water supply, and the neighboring properties damaged by and in the years 1983 through 1985. The policy is therefore implicated as a matter of law so long as there has been an occurrence.
This brings us to the next question, which is whether the events causing the property damage at issue in this case meet the policy definition of an occurrence.
The '83/'85 policy contains a hybrid definition of occurrence that is even more unusual than the definition contained in the '82 policy. The '83/'85 policy's definition of occurrence allows for coverage in successive policies for the same damage producing event. It is the particular language of the First State policies which drives such a seemingly strange result. It is specifically provided in the Policy that First State wrote it.
The '83/'85 policy definition of occurrence is more restrictive than that of the '82 policy in that the occurrence must take place within the policy period. However, damage causing events taking place prior to the policy period are nonetheless treated as occurrences taking place within the policy period so long as they would be "covered by underlying insurance policies and/or coverages written on a claims made basis but for the reduction or exhaustion of the aggregate limits of such underlying policies." The specific language is as follows:
 "OCCURRENCE" means an accident or a happening or an event or a continuous or repeated exposure to conditions which is unexpected and unintended from the standpoint of the Named Insured during the policy period. An accident or a happening or an event or a continuous or repeated exposure to conditions which occurs prior to the policy period, and would be covered by underlying insurance policies and/or coverages written on a claims made basis but for the reduction or exhaustion of the aggregate limits of liability of such underlying policies and/or coverages, is deemed to be an Occurrence during the policy period.
Kayser-Roth argued in its post-trial memorandum that it proved that coverage was available pursuant to the first sentence of this definition. The Court, however, finds that Kayser-Roth failed in that endeavor for two reasons. First, the Court rejects Kayser-Roth's argument that it was the "unexpected and unintended" state of mind, rather than the accident, happening, event, or exposure trigger itself, that had to happen during the policy period. Because the unexpected and unintended qualities only have meaning in relation to the trigger, the Court concludes that, while not paradigmatically drafted, the first sentence requires the trigger, and not just the concomitant mental state, to occur during the policy period. Second, because the occurrence here took place before the policy period, Kayser-Roth has failed to prove coverage pursuant to the first sentence of the definition of occurrence notwithstanding the existence of property damage throughout the policy period.
Kayser-Roth argues that it has also proved coverage is available pursuant to the second sentence of the "OCCURRENCE" definition. Kayser-Roth argues that the spill is an accident or happening or event or a continuous or repeated exposure to conditions which occurred prior to the policy period and was covered in part by an underlying insurance policy written on a claims-made basis. The excess, Kayser-Roth argues, would have been covered but for the exhaustion of that underlying policy.
At issue is the primary layer Aetna policy 01 AL 482897 SCA, itemized in the '83/'85 policy's schedule and the maintenance of which is required by the '83/'85 policy's terms. That policy, in evidence as Kayser-Roth's trial exhibit 30, is described in the schedule as a gradual environmental impairment liability (claims-made) policy and its language bears that out. The policy contains an other-insurance type clause which places its coverage as excess to other coverages but it also will drop down to provide primary coverage for claims for gradual environmental impairment made during the period January 1, 1984 through January 1, 1985. The trial evidence is that after being notified of the Stamina Mills EPA claim, Aetna registered that claim against this policy, that Aetna paid the balance of the $6 million dollar aggregate limit ($1,497,121.00) to Kayser-Roth for the Stamina Mills claim and that the aggregate policy limits were exhausted by that payment. The trial evidence is also that, in all, Aetna registered approximately ten claims against the policy and that those ten claims contributed to the exhaustion of the aggregate limit.
The policy language is clear and unambiguous. First State provides excess coverage for events taking place before the policy period and which would have been covered by the underlying policy but for the exhaustion of that policy. There is no dispute that Aetna covered $1,497,121.00 of the Stamina Mills loss under its claims-made policy and that this amount represented the balance of the aggregate limit. Thus, First State's excess coverage is triggered by the fact of the exhaustion of the underlying policy. The First State policy language is consistent with the general status of an excess carrier for which trigger of coverage is the exhaustion of the underlying limits. Seegenerally American Home Assurance Co. v. International InsuranceCo., 684 N.E.2d 14, 18 (N.Y. 1997); Costello v. Times SquareHotel Co., 567 N.Y.S.2d 231, 232 (N.Y. App. Div. 1991).
First State makes three arguments concerning trigger of coverage. First, that Kayser-Roth has failed to make out a prima facie case because it has not proved the validity of all of the various claims which contributed to the exhaustion of the aggregate limits of the Aetna policy. Second, that Aetna was factually and legally mistaken when it paid the claim under its 1984 gradual environmental impairment liability policy instead of its primary level comprehensive general liability policies. Third, that the '83/'85 policy follows form to the Aetna policy and that the relevant policy language precludes coverage. The first argument was raised during the trial. The other two are somewhat overlapping and have been asserted by First State throughout this litigation. The Court and the parties have referred to them loosely as First State's "Aetna defenses" and the Court will address them separately.
First State contends that in order to make out a prima facie case for trigger of coverage under the '83/'85 policy, Kayser-Roth had to demonstrate the validity of both the coverage and the payments afforded by the underlying Aetna policy. In other words, that the amounts paid to Kayser-Roth by Aetna and which contributed to the exhaustion of the aggregate limits of the underlying policy were something to which Kayser-Roth was legally and factually entitled. That Aetna may have determined that it was obligated to pay out on any given claim and thus exhausted the aggregate limits is beside the point argues First State.[13] First State contends that Kayser-Roth must prove not only that it was entitled to coverage under the Aetna policy for the EPA claim and to the $1,497,121.00 payment but also that each of the nine other claims contributing to exhaustion of the Aetna policy's aggregate limits were, in both fact and law, properly classified to be paid under that policy.
First State's contention concerning Kayser-Roth's obligation to prove, as part of its prima facie case, that the Aetna policy limits were validly exhausted raises the next question. To what extent may an excess carrier challenge the underlying carrier's determination that it is obligated to pay a claim under its policy?
Before undertaking the analysis of this question, it is important to note that during the trial First State abandoned the collusion and fraud allegations which it at one time asserted against Kayser-Roth. Furthermore, First State has not asserted in the context of this litigation any claim for Aetna's alleged mishandling of the Stamina Mills EPA claim or any other claim. The record of the case will reflect that it would have been entirely appropriate to join in this declaratory-judgment action the question of Aetna's handling of the Stamina Mills claim and First State's claim that Aetna breached its duty owed to First State to properly handle that claim. The Court also notes that to impose the burden of proof on Kayser-Roth as First State would like would require the Court to construe the policy language against Kayser-Roth and not in favor of coverage. Finally, it should be noted that what First State proposes amounts to the litigation of ten additional insurance cases — one for each of the claims contributing to the exhaustion of the Aetna policy.
It has been recognized in a number of courts that the remedy for an excess carrier having a quarrel with the underlying carrier's decision to pay under its policy is to bring an action against that underlying carrier for its mishandling of the claim.Hartford Accident Indem. Co. v. Michigan Mutual Ins. Co., 462 N.Y.S.2d 175 (N.Y. App. Div. 1983). Particularly where the primary insurer may have been acting in self-interest[14] and in disregard of the excess insurer's interest does the public policy support such an action based on an independent duty of care owed by the primary or underlying carrier to the excess carrier. Commercial Union Ins. v. Medical Protective Co.,356 N.W.2d 648 (Mich. Ct. App. 1984); Griffin, Excess LiabilityInsurance, 62 Marquette L. Rev. 375 (1979). Implicit in this approach must be that absent fraud or collusion between the insured and the primary carrier, the insured does not carry the burden of proving the soundness of the primary carrier's decision to pay and that it is for the excess carrier to seek redress from the underlying carrier should the excess carrier believe that the underlying carrier has exposed it to liability or caused it harm by mishandling the claim in some respect. Furthermore, since the triggering event for the First State '83/'85 policy is plainly the exhaustion of the underlying limit and since Kayser-Roth has proved such exhaustion, the burden is on First State to prove those matters to limit or defeat coverage. See General AccidentInsurance Co. of America v. American National Fireproofing, Inc.,716 A.2d 751, 757 (RI. 1998).
Thus, it is the Court's conclusion that First State's remedy, if it believes Aetna mishandled the claims leading to the exhaustion of the 1984 gradual environmental impairment liability policy, is to proceed against Aetna for its breach of its duty to First State. The Court concludes that Kayser-Roth does not bear the burden of proving the validity of the claims, coverage, or payments which led to the exhaustion of the 1984 Aetna policy in order for coverage to be triggered under the language of the First State policy.
 3. Trigger of Coverage — The Aetna Exclusion 5 Defense
Related to its argument that Kayser-Roth has not made out a prima facie showing of trigger of coverage by demonstrating the valid exhaustion of the Aetna 1984 gradual environmental impairment liability policy, First State also contends that Aetna had defenses to coverage and that it was legally and factually mistaken when it paid out on the EPA claim under its 1984 gradual environmental impairment liability policy 01 AL 482897 SCA. Specifically, First State contends that Exclusion 5 which is contained on page 3 of the Aetna policy is applicable. The relevant policy language is found at page 2 and states as follows:
 THIS POLICY SHALL NOT APPLY TO:
 5. LIABILITY ARISING FROM ENVIRONMENTAL IMPAIRMENT COVERED UNDER POLICY NO. 01AL4828955CA OR PREDECESSORS OR RENEWALS THEREOF.
First State contends that the Stamina Mills spill amounts to an occurrence which would have been covered[15] by the various primary occurrence-based comprehensive general liability policies which were once at issue in this case, including Aetna policy 01 AL 482895 SCA, its predecessors, or renewals thereof, and that, as a consequence, Exclusion 5 of policy 01 AL 482897 SCA would have applied. First State argues that because the exclusion applies, the Aetna gradual environmental impairment liability policy 01 AL 482897 SCA could not have been validly triggered. With the Aetna policy not having been validly triggered, it could not have been validly exhausted by the $1,497,121.00 payout and, therefore, First State's excess coverage is not implicated. Going one step further, First State contends that the primary layer occurrence-based comprehensive general liability policies to which it is also excess and which it alleges do in fact afford coverage have not been exhausted; therefore, its excess coverage remains untriggered.
Consistent with its contentions, First State attempted to prove through the testimony of various witnesses, including John Organ, Kayser-Roth's earlier assertions that the EPA claim would be covered by the various primary occurrence-based comprehensive general liability policies. It also introduced expert testimony to prove that the nature of the harm caused by the Stamina Mills spill was continuous and it stipulated with Kayser-Roth to facts which would support the application of a "continuous trigger" theory, that is, that the damage caused by the spill continued throughout the years after the spill. It also attempted to introduce exhibits comprised of numerous comprehensive general liability policies which it contends afford coverage for the Stamina Mills spill.[16] And it sought to make use of Kayser-Roth's pretrial contention that, as of 1994, its primary comprehensive general liability policies had not been exhausted.
First State's argument is, of course, dependent on a determination by the Court that Aetna policy number 01 AL 482895 SCA (or its predecessors or renewals) was triggered by a single occurrence taking place in one of the Aetna policy years or, in the alternative, the application of a continuous, injury-in-fact trigger of coverage from the time of the 1969 spill forward to the inception of the Aetna policies. As the Court has indicated earlier in this decision, the law of this jurisdiction is that the continuous dissemination of contaminants through seepage constitutes only one occurrence for purposes of an insurance policy. See Truk-Away of Rhode Island, Inc. v. Aetna Casualty Surety Co., 723 A.2d 309 (R.I. 1999). Further, the Aetna comprehensive general liability policies are not in evidence so it is impossible to determine whether policy number 01 AL 482895 SCA, its predecessors or renewal policies would have been triggered under their specific language. Even assuming the relevance and admissibility of the proffered Orgain testimony, the parties' stipulations concerning the continuous harm produced by the spill, and all of the other proffered evidence concerning Aetna's mistake in registering the claim against its 1984 gradual environmental impairment liability policy, First State is unable to prove the applicability of these other policies of insurance.
Thus, while First State argues Aetna should not have paid out under the 1984 gradual environmental impairment liability policy 01 AL 482897 SCA for the reason that there existed other insurance including Aetna policy 01 AL 482895 SCA (or its predecessors or renewal policies) which covered the claim but remained unexhausted, this contention is not supported by the trial evidence. First State's argument that the Aetna Exclusion 5 operates to defeat coverage under the '83/'85 policy must fail for that reason. Furthermore, and as set forth elsewhere herein, the Court cannot agree that the First State '83/'85 policy follows form to the underlying Aetna policies or that Kayser-Roth has the burden of proving Aetna was not in error when it determined it should pay out under its 1984 gradual environmental impairment liability policy.
 4. Broad as Primary Trigger of Coverage Under the Aetna Policy Language
The '83/'85 policy contains an endorsement number four, entitled "BROAD AS PRIMARY," that mirrors endorsement number four in the '82 policy. Although the Joint Stipulation of Facts does not identify, as it does with respect to the '82 policy, any specific paragraphs of underlying insurances the conditions of which First State contends have not been met, First State has argued throughout this litigation[17] that the broad-as-primary clause operates to amend its '83/'85 policy conditions so as to "follow form" to all of those other insurance policies to which it is excess and specifically to Aetna 01 AL 482897 SCA (Kayser-Roth trial exhibit 30). For the '83/'85 policy, then, and unlike for the '82 policy, the trial evidence does include the specific policy language which First State contends it "follows form." First State also contends that the effect of the '83/'85 policy's occurrence definition and the "maintenance" clause is to make the '83/'85 policy follow form to the Aetna policy. Specifically, First State points to the definition of "claim" contained in the Aetna policy. That definition is as follows
 II. DEFINITIONS
 FOR THE PURPOSE OF THIS POLICY:
 2. THE TERM "CLAIM" MEANS ANY SINGLE CLAIM OR ANY SERIES OF CLAIMS FROM ONE OR MULTIPLE CLAIMANTS RESULTING FROM THE SAME ISOLATED, REPEATED OR CONTINUING ENVIRONMENTAL IMPAIRMENT.
First State argues that the Court should construe and apply the Aetna policy 01 AL 482897 SCA "claim" definition such that the loss associated with the EPA claim would not be covered. More specifically, it is First State's contention that, for purposes of triggering the "claims made" coverage under the Aetna policy language, the Stamina Mills claim was not made in 1984 when the EPA served its PRP letter. Rather, it was made in 1981 when theLanglier action was brought and, as such, is not a claim made within the Aetna policy period. First State argues that, if the Aetna policy provisions to which the '83/'85 policy follows form are properly construed and applied then the losses associated with the EPA claim will not be covered by the '83/'85 policy as a matter of law. The facts relevant and material to First State's contention concerning the Aetna definition of a claim are not significantly disputed. The Langlier suit was filed in 1981. It was undeniably a claim which resulted from the same continuing environmental impairment as the EPA claim.
The Court will not repeat its broad-as-primary analysis set forth in the context of the '82 policy. Suffice it to say that even assuming for present purposes that the EPA claim is not included within the Aetna definition of "claim," this argument is of no avail to First State. The broad-as-primary provisions are not simply applicable.[18] Nor does the balance of the '83/'85 policy language make it a follow-form policy. To the extent that First State points to other exclusions, terms, and conditions contained in the Aetna policy to defeat coverage, the analysis is the same.
 5. The Known-Loss Defense
The Court's analysis concerning the '82 policy and the known-loss doctrine has been set forth earlier in this decision. Given the Court's determination that the eventuality of the EPA loss could not have been known by Kayser-Roth to be a substantial probability any earlier than 1984 when the EPA made its claim and given the undisputed fact that the '83/'85 policy incepted no later then January 1, 1983, First State's known-loss defense must also fail as to the '83/'85 policy.
 6. Limit of Liability
Having concluded that coverage under the '83/'85 policy has been triggered, the Court will consider next the extent or limit of First State's liability on that policy.
But first, the Court notes that contrary to the parties' belief that the '83/'85 policy provides $10 million dollars in separate limits for each year of the three-year policy (resulting in $30 million dollars of available coverage), the Court concludes that, as applied here, the '83/'85 policy is a continuous three-year term policy with a $10 million dollar single limit for any one occurrence and that because there has been only one occurrence $10 million, rather than $30 million, dollars are potentially available. The '83/'85 policy period is defined as January 1, 1983 to January 1, 1986, and although the premium is allowed to be paid in yearly installments, the policy period is nonetheless three continuous years, not three discrete years. See generally 3 Holmes' Appleman on Insurance 2d § 16.5, at 317 (1998) ("[w]here a policy uses the term policy period' in its singular grammatical sense, it denotes only one period [a]nd where the word `period' is used in a policy with reference to time, it refers to a continuous period"). Additional support for this conclusion can be found by looking to the "LIMIT OF LIABILITY" section in the Insuring Agreements, which provides as follows:
 III. LIMIT OF LIABILITY —
 The Company shall be liable for the ultimate net loss which is excess of either:
 (a) the limits of the underlying insurances as set out in the attached schedule as respects each occurrence covered by said underlying insurances,
 or
 (b) $100,000 ultimate net loss in respect of each occurrence not covered by said underlying insurances,
 and then only up to a further sum as stated in Item 3 (A) of the Declarations in all in respect of each occurrence — subject to a limit as stated in Item 3 (B) of the Declarations in the aggregate for each annual period during the currency of this Policy, but only for and separately in respect of Products Hazard or Completed Operations Hazard and in respect of Personal injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Insured.
Both item 3 (A) and 3 (B) of the Declarations provides for $10 million dollars of coverage. However, unlike the $10 million dollar "limit in the aggregate . . . for each annual period" provided for by Item 3 (B), the $10 million dollar limit provided for property damage in Item 3 (A) is a "single limit any one OCCURRENCE." Because there has been but one occurrence here, only $10 million dollars is potentially available in coverage.
By the policy language, the amount of First State's liability is limited to $10 million dollars of Kayser-Roth's ultimate net loss, that is, the total sum which Kayser-Roth, and/or any company as its insurer, becomes obligated to pay by reason of property damage either through adjudication or compromise. That liability is specifically provided to be excess of the amount recoverable under the insurance as set out in the schedule or, if the underlying insurance policies do not afford coverage, of $100,000.00 of the ultimate net loss. First State's liability under the '83/'85 policy for any one occurrence of property damage is limited to the ultimate net loss that is in excess, up to $10 million dollars, of the amounts recoverable under the underlying insurance policies set out in the policy's attached schedule. Although there are many policies listed in the schedule, only one is in issue and that is the Aetna comprehensive general liability policy previously discussed. Therefore, First State's liability to Kayser-Roth under the '83/'85 policy is for up to $10 million dollars in excess of $1,492,121.00 of Kayser-Roth's ultimate net loss. Furthermore, because First State failed to prove that its '83/'85 coverage should be excess to or should share liability with other insurance policies applicable to this same loss, First State's liability to Kayser-Roth is excess only to the $1,492,121.00 represented by the Aetna payments.
 7. '83/'85 Policy Conclusion
Having determined that Kayser-Roth made out a prima facie case of coverage under the '83/'85 policy, and having found that First State failed to prove its known-loss defense, and it being clear that First State has not paid under this policy, the Court concludes and declares that Kayser-Roth has proven that it is entitled to coverage under the '83/'85 policy for its ultimate net loss in excess of $1,497,121.00 representing the Aetna payment, up to a total of $10 million dollars.[19]
 IVThe Settlement Agreements and Kayser-Roth's Motion to Quash First State's Subpoena
During the course of the damages phase of this litigation, First State subpoenaed the written settlement agreements entered into between Kayser-Roth and the other carriers. It is First State's contention that it is entitled to "setoff" those amounts which the other carriers have paid to Kayser-Roth. While some of the background pertaining to the settlements can be gleaned from the record in this case, the Court deems it necessary to set out that background more fully.
Consistent with its regular practice, the Court encouraged the parties to undertake meaningful settlement discussions. And, with the permission of the parties, the Court met separately with counsel and their respective client-principals in an effort to define the impediments to settlement and to facilitate communications. Some discussions took place between the principals of Kayser-Roth and its carriers and some involved their attorneys only. While many of the negotiations took place in the parties' corporate and legal offices, a good percentage of the negotiations were hosted by the Court over a period of several months in the courtroom, the jury lounges, the courthouse hallways, and chambers. Initially, the carriers approached the negotiations globally, that is, they negotiated with Kayser-Roth as a unified front after each committed a specific amount of money to a settlement pool. Predictably, the unified front's unity proved fragile and it strained under the weight of the carriers' bickering over which had more risk of liability. And when the carriers began to argue over which should ante up more money to enlarge the settlement pool, deunification was imminent.
In an effort to break the impasse among the carriers and between them and Kayser-Roth, the Court encouraged the parties to undertake separate discussions, one on one, and suggested that each properly regard its exposure to liability and the risks of litigation. The parties agreed. They also agreed that the substance of the settlement talks would remain private and would be treated as confidential by all, including the Court. At the Court's direction, the parties participated in settlement conferences with the Court and, also at the Court's direction, their negotiating teams came to the settlement conferences with full authority to settle.[20] That is, all but First State. First State was the only carrier that arrived at the initial sessions without the requisite authority. The result was that the settlement conferences with First State had to be put off and rescheduled. First State ultimately came to the follow-up conferences with more authority to settle but never with full authority. First State's strategy was quite openly that of waiting out the settlement process until it could better assess how much Kayser-Roth might reap from other negotiations. After months of settlement talks all of the carriers except First State had settled with Kayser-Roth, with some of the dismissals being filed in the early days of trial. Then First State subpoenaed the settlement documents, seeking to sweep aside the parties' (including First State's) promises of confidentiality and hoping to place its liability in a position "excess" to Kayser-Roth's aggregate settlement amount.
The Court conducted an in camera review of the settlement documents and has sealed them and filed them with the record in this case. They are marked as "Court's Exhibit 1," for identification. The Court's review of the settlement documents reveals the following.
In all, there are sixteen settlement agreements. All are between Kayser-Roth and entities other than First State. There are twenty companies in total, not counting the many foreign market insurers and underwriters which joined as the "London Market Insurers" in a single settlement agreement. Altogether, the agreements identify or reference more than 120 separate insurance policies only about one-quarter of which is made up of those policies which First State has contended would cover the EPA claim. Each agreement identifies four categories of potential claims or losses over which Kayser-Roth and the other settling company have entered their settlement agreement. The categories of potential claims and losses settled include not only past and future cleanup costs at the Stamina Mills site but also Kayser-Roth's claims for tort and breach of contract damages, punitive damages, attorney's fees, interest, and other relief, and other tort claims and contractual rights which Kayser-Roth may potentially assert against the particular company. None of the agreements assign any specific value or dollar amount to any one item contained within the broad mix of mutual claims and obligations which they settle. In other words, the consideration given by one party to the other as part of their exchange of mutual rights and obligations is not allocated among or specifically attributed to the various breach of contract and tort claims or the various resultant losses which have been asserted within the context of this litigation. Nor do the agreements separate the specific claims which have been asserted in this action from such other claims that the parties may have against each other but which they have settled by virtue of the settlement agreement. Of the twenty companies executing settlement agreements with Kayser-Roth, only seven were identified by First State in its answers to interrogatories as having issued insurance policies which provide coverage for the EPA loss. In conducting its review of the settlement agreements the Court found it impossible to determine what portion of the monies or other consideration, if any, was paid by any given company in settlement of its potential liability to provide insurance coverage for the EPA loss — much less in settlement of any particular policy. The various tort claims, contractual obligations, and breach of contract losses settled by each agreement are so generalized that the Court cannot, even with an eye to the trial evidence, discern how the parties came to the settlement amounts or whether they intended, if at all, to allocate any particular dollar paid in settlement toward the EPA loss or any specific policy of insurance. Thus, even were First State not precluded by the Court's pretrial order from introducing these settlement agreements into evidence, these agreements would not be relevant because they are of no probative value in determining what other insurance exists or has been paid to cover the EPA claim.
Nonetheless, First State claims it is entitled to a "setoff" of the total settlement amounts and that therefore the dollar amount of the settlements should be admissible even if the agreements are not. "Setoff" of course, is not the appropriate remedy if First State is to take advantage of Kayser-Roth's settlements because "a set-off is in effect a cross-action,"Banigan v. Woonsocket Rubber Co., 21 R.I. 171, 173, 42 A. 518, 518 (1899). "The right of setoff allows parties that owe mutual debts to each other to assert the amounts owed, subtract one from the other, and pay only the balance." Darr v. Muratore,8 F.3d 854, 860 (1st Cir. 1993). Implicit in setoff is that the debts being offset are debts running between the same parties and it is not appropriately applied when, as here, a party attempts to reduce its debt by receiving credit for the debt owed by some other individual to the plaintiff. First State would have the Court reduce what it owes Kayser-Roth by what Kayser-Roth was owed or paid by the other carriers. Although First State characterizes this as "setoff," it is in reality an attempt to take advantage of what are, at best, Kayser-Roth's collateral sources.
"The collateral source doctrine mandates that evidence of payments made to an injured party from sources independent of a tort-feasor are inadmissible and shall not diminish the tort-feasor's liability to the plaintiff. `The rationale of this rule is that the injured person is entitled to be made whole, since it is no concern of the tort-feasor that someone else completely unconnected with the tort-feasor has aided his victim' and the `wrongdoer, responsible for injuring the plaintiff, should not receive [this] windfall.'" Gelsomino v. Mendonca,723 A.2d 300, 301 (R.I. 1999) (internal citations omitted). "In this state the collateral source doctrine has been applied in its most comprehensive sense." Oddo v. Cardi, 100 R.I. 578, 584,218 A.2d 373, 376 (1966). Moreover, the doctrine applies to contract as well as tort cases. In re Emergency Beacon Corp., 48 B.R. 341, 350 (D.C. 1985); see also Rutzen v. Monroe County, 429 N.Y.S.2d 863 (N.Y. Sup. Ct. 1980); Oden v. Chemung County IndustrialDevelopment Agency, 637 N.Y.S.2d 670 (N.Y. 1995).
At the outset, it should be pointed out that First State has been precluded by its conduct from introducing any trial evidence that other insurance exists to cover Kayser-Roth's losses as a result of the Stamina Mills spill. To the extent that it could be gleaned from the settlement agreements that there exists other insurance to cover the EPA claim and to which First State's liability is excess, these documents are inadmissible for that purpose. Nor are these documents admissible for the purpose of allocating First State's pro rata share of the damages. It is also important to remember that the First State insurance contracts are not silent on the question of how Kayser-Roth's other sources of insurance should be treated by it and First State. The other-insurance and maintenance clauses speak directly to the matter and set forth the parties' contractual agreement concerning the availability of the only true collateral source of compensation for Kayser-Roth's loss, that is, other insurance. Having placed itself in a position where it could not carry its burden of proof in enforcing its contractual rights concerning the existence of Kayser-Roth's other insurance, First State would now have the Court apply equitable principles in order to place it in a position excess not only to the proceeds of what might be Kayser-Roth's other insurance but also to the proceeds of Kayser-Roth's noncorresponding sources of funds, that is, its settlements with its other carriers on matters such as its bad faith claims, claims for attorney's fees spent in the maintenance of this action, punitive damage claims, and its compromise of unrelated contractual rights. With the vagaries associated with carrying its burden of proving the existence of corresponding other insurance behind it, First State now reaches for a broader pool of resources to sit above.
It is the Court's conclusion that although public policy mitigates against Kayser-Roth receiving a windfall, public policy mitigates more strongly against First State receiving a windfall.See generally Restatement 2d Torts § 920A cmt b, at 514 ("Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiffs injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance[,] . . . the law allows him to keep it for himself.").
More specifically, mitigating in favor of allowing First State to setoff Kayser-Roth's combined collateral and non-collateral sources is that Kayser-Roth might indeed be prevented from reaping a windfall to the extent that some of the settlement funds do indeed correspond to the compromise of other insurance which is applicable to this loss. It is also an indirect means of enforcing First State's contractual right to sit as excess to other applicable insurances notwithstanding First State's failure to carry its burden of proof at trial. Conversely, to allow First State to setoff against its own liabilities Kayser-Roth's combined collateral and non-collateral sources would create windfall for a party which is guilty of a breach of contract and which has failed to establish at trial the extent to which it has a legitimate contractual right to a setoff. Furthermore, allowing insurance carriers to place themselves excess to settlements with carriers providing concurrent insurance would discourage settlements — the carriers would simply attempt to wait each other out in the hope that the claim is paid from the settlements before their own insurance fund can be reached.
Except in the most general way, there is no means for the Court to attribute portions of the gross settlement funds to any particular policy or policies of insurance and thus ferret out what are Kayser-Roth's truly collateral sources for the EPA claim. The settlements show how much each carrier paid in overall settlement and also what policies of insurance it issued. Beyond that the settlement proceeds are not allocated and do not correspond to the particular category of claims which they purport to settle. The Court's attempt to allocate the settled claims to dollar amounts by weighing the claims settled by each carrier against the settlement amount paid by it would require rank speculation. First State would solve this problem by off setting the entire settlement fund or, at least, the entire settlement amounts from the carriers it has alleged provide coverage under their policies. It is the Court's conclusion that there is no equity done by permitting First State to parlay its breach of its contractual obligations and its missed opportunity to prove at trial to what other insurance it is legitimately excess into a means for reducing its own liability — particularly at what is still Kayser-Roth's expense.
For the foregoing reasons, Kayser-Roth's motion to quash the subpoena duces tecum is granted. The Court has determined that neither the substance of the agreements nor the settlement amounts are relevant to the issues in this case.
 V DAMAGES
In its cross-claims against First State, Kayser-Roth has claimed it is entitled to several elements of damages. Those elements include Kayser-Roth's costs for defending the suit brought against it by the EPA, the amounts it is legally obligated to pay in order to remediate the damage caused by the TCE spill, and its attorney's fees for this declaratory-judgment action.
At the time of trial, Kayser-Roth had paid only a portion of the costs it is obligated to pay for the cleanup project, which by all accounts was expected to continue for years. Initially, Kayser-Roth sought a single and final judgment to cover its projected costs. However, as the proof unfolded during the damages phase of the trial, Kayser-Roth encountered difficulty proving future remediation costs with reasonable certainty. Therefore, Kayser-Roth conceded (and First State agreed) that it might be appropriate for the Court to hold limited hearings on the question of the actual amounts which Kayser-Roth will become legally obligated to pay a result of the EPA Amended Administrative Order of June 4, 1991 and its implementation of the EPA mandated remediation plan.
Although Kayser-Roth presented trial evidence concerning the cleanup costs which it had already become obligated to pay, it did not present evidence concerning its costs incurred in this litigation or the costs of defeating the EPA action. The former necessarily awaits the Court's decision in this case. The latter, too, has been deferred by the Court and the parties until after the Court's decision.
It is undisputed that First State refused to defend Kayser-Roth in the suit brought against Kayser-Roth by the EPA. Nor did it participate on Kayser-Roth's behalf in the administrative proceedings which produced the September 28, 1990 record of decision and the subsequent Amended Administrative Order of June 4, 1991 which, in turn, produced Kayser-Roth's contract with its supervising contractor and the highly detailed remediation plan that Kayser-Roth is legally obligated to implement in order to discharge its liability to the EPA for the damages caused by the spill. First State has not alleged that it ever attempted to assert, on behalf of Kayser-Roth and within the context of the administrative proceedings, any defenses to the EPA's claims for reimbursement which may be permitted under any applicable rules, regulations, or laws. It does not allege that it participated or attempted to participate in the selection of the supervising contractor or the negotiation of its contract. It does not allege that Kayser-Roth breached its duty to cooperate with First State in the defense of the EPA action.
The Court will address each element of Kayser-Roth's claimed damages in turn.
 A. Reimbursement of the EPA Cost Assessments
The trial evidence was that the EPA has, consistent with its administrative procedures, submitted to Kayser-Roth a draft summary or interim estimate of its costs relating to the remedial investigation/feasibility study and remedial design oversight for the Stamina Mills site. The total site costs estimated to be assessed by the EPA were $3,303,888.13 exclusive of interest and other unrecovered costs. At the time of trial, then, the EPA had not made a final decision with respect to these costs. The language of the Amended Administrative Order of June 4, 1991 is clear in that Kayser-Roth is required to reimburse the EPA's response costs within thirty days of the submission of the final decision and demand for payment. Failure to perform consistent with the Order is a violation which can lead to further action against Kayser-Roth, including sanctions.
Since the time of trial, Kayser-Roth has advised the Court and First State that the EPA has indeed rendered a final-cost report for $5,380,938.11. In an August 23, 1996 submission to the Court, Kayser-Roth also proposed the admission of several more "damages phase" trial exhibits. For purposes of keeping the record in this case, the Court has marked this submission and its included exhibits for identification as "Court's Exhibit 2." Included within the exhibit is the August 8, 1996 deposition testimony of Phillip Coop. That testimony was taken by the agreement of the parties for the purpose of taking evidence on the matter of final-cost report. The Court has reviewed the transcript and, given that First State has voiced a number of objections to portions of Coop's testimony, the Court declines to admit the deposition testimony into evidence until it hears from First State and Kayser-Roth on those objections if that should become necessary. The parties have, however, stipulated that the EPA final invoice may be admitted into evidence. That stipulation appears in the Court's Exhibit 2[21] materials identified as Kayser-Roth's proposed trial exhibit 1433. The proposed exhibit 1433 consists of a May 13, 1996 letter from First State's trial counsel to trial counsel for Kayser-Roth. The letter is a rough reiteration of First State's reasons that it should not be liable to pay the costs of cleanup.
Astoundingly, First State has contended throughout this litigation that Kayser-Roth should mitigate its damages by engaging in line item wrangling with the EPA over charges that Kayser-Roth is obligated to pay as a matter of law. As the Court has noted, First State has not offered any evidence that it has successfully defended Kayser-Roth against any portion of the EPA final costs report such that Kayser-Roth is not liable to the EPA in the full amount of the assessment. So, while First State may contend that the EPA charges are too high, are redundant, or that Kayser-Roth should attempt to mitigate its damages by contesting or negotiating the charges, First State has missed its opportunity to defend Kayser-Roth against the EPA and cannot now stand back and quibble with the job Kayser-Roth has done in defending itself. As the Court has noted, the Amended Administrative Order of June 4, 1991 is quite clear in requiring payment within thirty days of the final cost report. Delays in performance are deemed a violation of the Order and could lead to consequences unfavorable to Kayser-Roth. The language of the policies is clear and unambiguous. First State is obligated to pay that which Kayser-Roth is obligated to pay as damages.
The Court therefore finds that Kayser-Roth has proved it is entitled to damages in the amount of $5,380,938.11 plus statutory interest thereon. The Court further finds and declares that Kayser-Roth is entitled to recover against First State any other additional amounts which may have been finally assessed against Kayser-Roth by the EPA for reimbursement of the EPA's costs — subject to a hearing limited to establishing the precise amount of those additional assessments and giving to First State an opportunity to prove that Kayser-Roth is not required by law to pay those amounts to the EPA.
 B. Costs of the Supervising Contractor
Phillip Coop testified. Coop is the president and founder of Environmental Safety Designs (Ensafe) which is a firm specializing in environmental management, including hazardous-materials response management and remediation cost analysis. Ensafe is under contract with Kayser-Roth to implement the EPA's June 4, 1991 Amended Administrative Order compelling Kayser-Roth to perform the remedial activities as generally set forth in the EPA's Record of Decision dated September 28, 1990. Ensafe is the supervising contractor with the single-point accountability required by the EPA. There is no dispute that the contract is a legally valid and binding contract, that Kayser-Roth is legally obligated to pay Ensafe for services it renders in accordance with that contract, or that Kayser-Roth was compelled by the Amended Administrative order to enter into such a contract with Ensafe or some similarly qualified contractor.
The contract is comprehensive and covers all of Ensafe's responsibilities in implementing the remediation plan. As part of Ensafe's contractual obligations to Kayser-Roth, Ensafe must report to Kayser-Roth anything it believes to be an error on the part of the EPA or any EPA imposed requirements which are inconsistent with the federal national contingency plan, unlawful or contrary to CERCLA. The contract also contains language which states that "no work shall be deemed to comply with the contract documents unless it receives, in addition to the approval of Kayser, all necessary approvals from [the EPA]." Combined, the Amended Administrative Order compelling Kayser-Roth to engage a qualified contractor, the EPA's rules and regulations, and the contractual requirement that work not be deemed to comply until approved by the EPA serve to ensure that the EPA's and Ensafe's activities, as well as the cost of those activities, fall within what is required by CERCLA and the EPA and is necessitated by the remediation plan.
Coop testified that it was Ensafe's engineers who developed the cost estimations required by the EPA regulations to be made at the feasibility stage. It was Coop's opinion that the preliminary design report developed as a part of the remediation plan would be accepted by the EPA as the final design. He testified that the design report was developed with input from and through consensus building with the EPA. It was Coop's opinion that the future costs of the project would reach approximately $20 million dollars. To the extent that Coop testified there would be substantial future costs associated with the Stamina Mills cleanup, the Court accepted Coop's opinion as credible. The Court was not persuaded, however, that the cleanup costs could be sufficiently estimated such that judgment could be entered against First State for a specific amount. Coop was able to credibly testify concerning the payments Kayser-Roth has made to Ensafe for its invoices. The Court finds that Ensafe's charges of $2,779,597.41 represent work performed within the scope of the remediation plan, performed under and covered by the supervising contractor agreement, necessitated by the Amended Administrative Order of June 4, 1991, and are amounts which Kayser-Roth is legally obligated to pay.
As the Court has noted, the language of the policies is clear and unambiguous. First State is obligated to pay that which Kayser-Roth is obligated to pay as damages. That the EPA has ordered Kayser-Roth to carry the burden of implementing and paying for the remediation by engaging contractors such as Ensafe rather than the EPA doing that itself is of no consequence.
The Court therefore finds that Kayser-Roth has proved it is entitled to damages in the additional amount of $2,779,597.41 plus statutory interest thereon. The Court further finds and declares that Kayser-Roth is entitled to recover against First State any other additional amounts which Kayser-Roth is obligated to pay pursuant to its contract with Ensafe — subject to a hearing limited to establishing the precise amount of those additional payments and giving First State an opportunity to prove that Ensafe's charges are clearly outside and not arguably within the scope of the remediation plan and the contract.
 C. Costs of Defense in United States v. Kayser-Roth Corporation
The First State policies clearly impose an obligation on First State to defend Kayser-Roth against any suit brought against it which alleges liability under the provisions of the policy. The language is found in the insuring agreements section II entitled "DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS." Payments under this section are in addition to the Limits of Liability stated in the policy declarations and are not included as part of the insured's ultimate net loss. It is not disputed that Kayser-Roth incurred substantial costs in defending the EPA's suit against it and that First State refused to defend Kayser-Roth in that action. The Court finds that First State has breached it contractual obligation to defend Kayser-Roth and that Kayser-Roth is therefore entitled to a hearing and final judgment on those costs. See generally Conanicut Marine Services, Inc. v.Insurance Company of North America, 511 A.2d 967, 971 (R.I. 1986); Illusion Hair Designers, Inc. v. Commercial Union Ins.,
581 N.Y.S.2d 312 (N.Y. App. Div. 1992).
 D. Attorney's Fees for this Declaratory-Judgment Action
The law is well settled that "`[a]n insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract,'"Conanicut Marine Services, Inc. v. Insurance Company of NorthAmerica, 511 A.2d 967, 971 (R.I. 1986). See also Illusion HairDesigners, Inc. v. Commercial Union Ins., 581 N.Y.S.2d 312 (N Y App. Div. 1992) ("When an insurer brings a declaratory judgment action to determine its duty to defend and indemnify which is unsuccessful, it must pay the insured for the defense of both the underlying action and the declaratory judgment action (Colon v.Aetna Life Cas. Ins. Co., 66 N.Y.2d 6)."). Kayser-Roth is therefore entitled to a hearing on the question of its litigation costs and to a final judgment for the amount of those costs.
 E. Damages Conclusion
Thus the Court reaches its conclusion that Kayser-Roth is entitled to recover from First State (1) the sum of $5,380,938.11 representing the final EPA reimbursement charges plus statutory interest thereon, (2) additional costs of reimbursement which have been or do become finally assessed against Kayser-Roth by the EPA plus statutory interest thereon, (3) the sum of $2,779,597.41 representing the Ensafe charges to the time of trial plus statutory interest thereon, (4) additional costs that are within the scope of the remediation plan and which Kayser-Roth is legally obligated to pay, (5) the reasonable and necessary costs incurred by Kayser-Roth in defending the action brought against it by the EPA, and (6) the reasonable and necessary costs incurred by Kayser-Roth in compelling First State to fulfill its obligations under its insurance contracts by way of this declaratory judgment and breach of contract action.
Pursuant to the administrative order of Presiding Justice Rodgers assigning the management of this case to this trial justice, the Court will continue to manage the case and will schedule further hearings on damages as may become necessary. Kayser-Roth's claims for bad faith shall remain severed and stayed until the judgment concerning First State's liability becomes final.
 VI FINAL DECLARATIONS
In accordance with the forgoing findings of fact and conclusions of law the Court declares that First State is liable under policies 950506 and 951721 to Kayser-Roth for Kayser-Roth's losses incurred as a result of the 1969 Stamina Mills spill; that First State breached its insurance contracts with Kayser-Roth by its failure to defend Kayser-Roth in the matter of United Statesv. Kayser-Roth Corporation, and that First State's liability includes liability for (1) the sum of $5,380,938.11 representing the final EPA reimbursement charges plus statutory interest thereon, (2) additional costs of reimbursement which have been or do become finally assessed against Kayser-Roth by the EPA plus statutory interest thereon, (3) the sum of $2,779,597.41 representing the Ensafe charges to the time of trial plus statutory interest thereon, (4) additional costs that are within the scope of the remediation plan and which Kayser-Roth is legally obligated to pay, (5) the reasonable and necessary costs incurred by Kayser-Roth in defending the action brought against it by the EPA and (6) the reasonable and necessary costs incurred by Kayser-Roth in compelling First State to fulfill its obligations under its insurance contracts by way of this declaratory judgment and breach of contract action.
Pursuant to Rule 54 (b), the Court expressly determines that there is no just reason for delay and expressly directs entry of final judgment as to the Court's declaration of liability, its particularized damages award, and its declaration of entitlement to future costs and other damages. Final judgment will be entered by the Court on the remaining damages claims after such additional hearings as may become necessary.
[1] Citations to "Rule #" are to the Superior Court Rules of Civil Procedure.
[2] Although Kayser-Roth failed to certify that it had conferred with First State in an effort to secure the information without court action, see Rule 37 (a)(2), because Rule 37 "does not create a prerequisite to addressing the merits of a discovery motion," Reidy v. Runyon, 169 F.R.D. 486, 491 (E.D.N.Y. 1997), the Court exercised its discretion to waive strict compliance with the conference requirements. The Court decided to so exercise its discretion for two reasons: first, given the then-imminent trial date, "the exigencies of time require[d] speedy action," id., and second, given the parties' demonstrated inability to reach any accord on their own, "the goal of discovery to encourage compromise [was]. . . unlikely to be achieved," id. Finally, the Court's and the parties' near-continuous state of conference during the pretrial period rendered the certification requirement a mere formality.
[3] It is not lost on the Court that had Aetna agreed that the claim was covered by one of its primary comprehensive general liability policies, rather than its 1984 gradual environmental impairment liability policy, a subsequent Court ruling that applied a continuous trigger of coverage theory might have resulted in a trigger of coverage for a series of other Aetna occurrence-based, primary comprehensive general liability policies which were once at issue in this declaratory-judgment action.
[4] Aetna Policy 01 AL 482855 SCA, referred to in the joint Stipulation of Facts, is not listed in the "SCHEDULE OF UNDERLYING INSURANCE" which is appended to the '82 policy and to which the First State policy is specifically identified as excess. Nor was this policy offered as evidence at trial. Thus, the policy terms contained in those stipulated paragraphs remain unknown. Aetna Policy 01 AL 482811 SCA, on the other hand, is itemized on the schedule and, while its specific terms remain unknown because it is not in evidence, the schedule provides a general description of that policy as well as its limits.
[5] The schedule shows an underlying gradual environmental impairment liability policy (01 AL 482811 SCA) covering a portion of the '82 policy term. This policy is identified on the schedule as a "claims made" policy and has therefore not been put at issue by the parties.
[6] "`Drop-down' coverage exists when an insurance carrier of a higher level of coverage is obligated to provide coverage that the carrier of the underlying level of insurance coverage has agreed to provide." Insurance Company of North America v. West ofEngland Shipowners Mutual Insurance Ass'n, 890 F. Supp. 1292, 1294 (E.D. La. 1995). The '82 policy's Limit of Liability clause, section III(b)(2), provides that the First State policy will, in the event of exhaustion of the underlying limits, continue in force as underlying insurance.
[7] See Gladstone v. D.W. Ritter Co., 508 N.Y.S.2d 880, 883 (N.Y. Sup. Ct. 1986) ("the words "total amount of valid and collectible insurance' . . . mean insurance which is capable of protecting the insured. It merely excludes invalid or illegal insurance (such as insurance which is voidable for misrepresentation) and uncollectible insurance (such as insurance of an insolvent company)."); Hellman v. Great American InsuranceCo., 136 Cal.Rptr. 24, 27 (Cal. Ct. App. 1977) ("[g]enerally, the clause ["valid and collectible insurance'] refers to insurance which is legally valid and is underwritten by a solvent carrier" or insurance for which the policy limits have not been exhausted).
[8] At trial, First State attempted to introduce into evidence copies of over thirty separate policies of insurance. The introduction of all these policies was precluded consistent with the Court's pretrial order. First State also offered a so-called coverage chart which laid out the numerous other potential coverages for the Stamina Mills spill. The coverage chart, prepared by counsel for INA as a pretrial aid, was likewise kept from evidence. The parties to this case have never agreed that the chart rendered a complete and accurate portrayal of the policies and their actual coverages.
[9] In November 1995, First State filed a motion for summary judgment contending that endorsement number four "essentially provides that [the First State policies] follow form to Aetna's underlying gradual environmental impairment liability policies." The Aetna policies which First State put at issue in the context of the motion included policies 01 AL 482855 SCA and 01 AL 482811 SCA. First State continued to assert "follow form"-based arguments in its trial memoranda.
[10] An excess policy covering the same risks that are covered by the underlying policy is known as a `following form' policy."Coleman Company, Inc. v. California Union Insurance Co.,960 F.2d 1529, 1530 n.1 (10th Cir. 1992); see also Archer-Daniels-MidlandCo. v. Phoenix Assurance Company of New York, 975 F. Supp. 1124, 1135 (S.D. Ill. 1997) ("To the extent that an excess policy incorporates the terms of an underlying policy[,] . . . those provisions will govern the parties' rights under the excess policy. In fact, excess policies often provide coverage for the exact same risks that are covered by the underlying insurance policy. This type of excess policy is called a `following form' policy.") It has been the Court's observation that "follow form" policies generally do not specify any terms and conditions of coverage but rather contain language which incorporates by reference and relies on the terms and conditions of underlying policies to define their insuring obligations.
[11] It is undisputed that New York is where the policies were brokered and accepted. While the location of the insured premises and the events leading to trigger of coverage took place in Rhode Island, it seems clear that New York law ought to be applied to the parties' contractual relations. See generally Gordon v.Clifford Metals Co., 602 A.2d 535, 537 (R.I. 1992) ("[i]t is well settled that the forum state is required to apply its own conflict-of-law rules"); Baker v. Hanover, 568 A.2d 1023, 1025 (R.I. 1990); Tim Hennigan Co. v. Anthony A. Nunes, Inc.,437 A.2d 1355, 1357 (R.I. 1981) ("[t]he rule is well settled that a contract is deemed made at the place where acceptance of the offer took place"); Owens v. Hagenbeck-Wallace Shows Co.,58 R.I. 162, 171, 192 A. 158, 163 (1937) ("the contract is to be interpreted according to the law of the place where the parties, as an actual fact, made and executed the contract").
Although the Rhode Island Courts have not spoken directly on the doctrines of known risk, known event, known loss, and loss in progress, but see Bartholomew v. Insurance Company of NorthAmerica, 655 F.2d 27, 29 (1st Cir. 1981) (affirming award of defendant insurers' motion for summary judgment under Rhode Island law stating that "[t]he concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty[;] [t]hus a homeowner could not insure his house against flood damage when the rising waters were already in his front yard"), the holding in Bartholomew is consistent with the general policies and principles supporting the known-loss doctrine.
[12] Furthermore, in a claims-based policy such as the '83/'85 policy, the loss insured against is not the initial injurious event but rather a claim brought over that event. A single injurious event may generate a number of claims, all at different times and by different people for different forms of damage. It would have been a simple matter for First State to require disclosure of previous events and/or to exclude losses flowing from previous events.
[13] It is in keeping with this contention that First State asserts its "Aetna defenses." First State contends that the policy defenses or arguments upon which Aetna could have relied to deny to coverage should likewise be available to First State and/or that Kayser-Roth must prove all aspects of valid coverage under the Aetna policy in order to prove coverage, including trigger of coverage, under the First State policy. First State argues that although Aetna did indeed treat the Stamina Mills EPA claim as covered under one of its policies, Aetna need not have done so because the policy provisions would not have required as much. That Aetna in fact registered the claim against that certain policy and paid out under it is of no consequence, contends First State. What is of significance here, contends First State, is whether the claim would be validly covered had the policy terms been correctly construed and applied. In this fashion, First State makes its segue from its own policy language to that of the Aetna policy.
[14] As the Court has previously noted, Aetna may have been motivated by self-interest in treating the loss as covered by its 1984 claims-made gradual environmental impairment liability policy. Aetna had also written several years worth of primary level comprehensive general liability coverages which could have been implicated by the application of a continuous trigger-of-coverage theory. At the time, the law concerning trigger-of-coverage was less certain.
[15] For purposes of this argument, First State necessarily ignores what have been its ongoing assertions that its policies also follow form to the underlying Aetna comprehensive general liability policies that contain exclusions or other terms and conditions the application of which would defeat coverage.
[16] First State attempted to introduce into evidence a number of INA, Aetna, and other comprehensive general liability policies including Aetna policy 01 AL 482895 SCA, its purported predecessors and renewals. It was, however, precluded from doing so by the Court's pretrial order which kept from evidence other policies of insurance which First State might contend existed to cover the Stamina Mills spill. First State's contentions concerning the Aetna Exclusion 5 serve to underscore the significance of the parties' pretrial discovery dispute over what other insurance coverage existed for the Stamina Mills spill as well as the significance of First State's refusal to disclose its contentions in that regard. Depending upon its immediate purposes, First State has contended that the same policy of insurance does or does not provide coverage.
[17] First State asserted this argument in a November 1995 motion for summary judgment.
[18] Even if First State were assumed to be correct in its contention that the Aetna gradual environmental impairment liability policies do not afford coverage, First State's dubious broad-as-primary argument only becomes even more irrelevant. The broad-as-primary endorsement is clearly designed to resolve conflicts between First State's excess coverage and the coverage afforded by the underlying policies. Any amendment to the First State language by virtue of the broad-as-primary endorsement will take place only when there is a conflict with the applicable underlying policy affording coverage and will be limited to the narrow portion of the First State policy language in conflict with that of the underlying coverage. It would make no sense to apply the broad-as-primary conflict resolution mechanism to an underlying policy which does not afford coverage for the loss.
[19] Because the '83/'85 policy does not contain an applicable noncumulation clause, and because both the '82 and the '83/'85 policies otherwise respond to the loss here, coverage is available from both successive policies.
[20] By "full authority to settle" the Court means a negotiator's authority to bind their client to a settlement for the full amount of the demand, provided, of course, that the negotiations persuade the negotiator that full settlement is appropriate. This expedites negotiations by eliminating a negotiator's ability to manipulate the process by hiding behind the timeworn excuse of having to get back to their client for more authority.
[21] Court's Exhibit 2 has been sealed for the reason that it appears to contain confidential EPA cost recovery information.